# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

DELAWARE STATE SPORTSMEN'S   :
ASSOCIATION, BRIDGEVILLE RIFLE   :
& PISTOL CLUB, LTD., and JOHN R.   :   C.A. No. K18C-05-047 JJC
SYLVESTER,   :   In and for Kent County
  :
Plaintiffs,   :
  :
  :
v.   :
  :
  :
SHAWN M. GARVIN, DELAWARE   :
DEPARTMENT OF NATURAL   :
RESOURCES AND ENVIRONMENTAL :
CONTROL, MICHAEL T. SCUSE, and   :
DELAWARE DEPARTMENT OF   :
AGRICULTURE,   :
  :
Defendants.   :

Submitted: July 26, 2018
Decided: October 11, 2018

## OPINION

Upon the Parties' Cross Motions for Summary Judgment
**GRANTED** in part and **DENIED** in part.

Francis G. X. Pileggi, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware, Jamie L. Inferrera, Esquire, (*pro hac vice*) Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, Pennsylvania, Attorneys for Plaintiffs.

Ralph K. Durstein, III, Esquire and Devera B. Scott, Esquire, Deputy Attorneys General, Delaware Department of Justice, Dover, Delaware, Attorneys for Defendants.

**CLARK, J.**

Plaintiffs Delaware State Sportsman's Association, Bridgeville Rifle & Pistol Club, Ltd. and John R. Sylvester (hereinafter "Plaintiffs") seek a declaratory judgment regarding their rights under regulations issued by the Delaware Department of Natural Resources and Environmental Control and the Delaware Department of Agriculture (hereinafter collectively the "Agencies"). Plaintiffs challenge newly promulgated regulations that they allege infringe upon their rights to keep and bear arms and to be free from unreasonable searches and seizures.

For the reasons discussed below, a straightforward application of the Delaware Supreme Court's decision in *Bridgeville R. & P. Club v. Small*[1] (hereinafter "*Bridgeville I*") requires the Court to hold that some of the Agencies' newly promulgated regulations violate Article I, Section 20 of the Delaware State Constitution. Furthermore, other portions of the regulations require a State Park or Forest guest to produce identification to law enforcement officers absent reasonable articulable suspicion of illegal activity. Accordingly, they violate the Fourth and Fourteenth Amendments to the United States Constitution as well as Article I, Section 6 of the Delaware Constitution. Finally, with one exception, *Bridgeville I's* reasoning demonstrates that the General Assembly did not statutorily preempt the field of firearm regulation. For these reasons, and those that follow, the Parties' cross motions for summary judgment are **GRANTED** in part and **DENIED** in part.

## Background and Stipulated Facts

On December 7, 2017, in *Bridgeville I,* the Delaware Supreme Court invalidated regulations prohibiting firearm possession in State Parks and Forests.[2] The Department of Natural Resources and Environmental Control (hereinafter "DNREC") and the Delaware Department of Agriculture (hereinafter "DDA")

---

[1] *Bridgeville R. & P. Club v. Small*, 176 A.3d 632 (Del. 2017).
[2] *Id.* at 636.

2

had promulgated these regulations many years before the Delaware Supreme Court held them to be unconstitutional in *Bridgeville I*.[3] After the *Bridgeville I* decision, the Agencies drafted emergency regulations that took effect on December 26, 2017, to temporarily fill the void left by that decision.[4]

The Agencies invited and received public comment regarding the interim regulations to make them final. They also published them in the February 1, 2018, issue of the Delaware Register of Regulations.[5] Thereafter, the Agencies scheduled public workshops regarding the new regulations. In support, they created a series of detailed satellite maps delineating the sensitive areas where visitors, other than concealed carry permit-holders and active and qualified retired law enforcement officers, were barred from possessing firearms. The Agencies then held a joint public hearing on March 12, 2018, and then accepted further public comment.

The Agencies' record includes, *inter alia*, the findings of fact within the orders promulgating the final regulations, the hearing officer's report dated April 9, 2018, and the two legal responses by Mr. Durstein addressed to the Agencies' hearing officer, dated April 10, 2018. It also includes correspondence and studies submitted by both sides of the gun rights issue.

On April 16, 2018, the Secretaries of DNREC and DDA extended the effective dates of the interim regulations for an additional 60 days and signed orders promulgating final revised regulations. The final regulations were

---

[3] *Id.* at 644.

[4] Under those regulations, the holders of concealed carry permits and both active and qualified retired law enforcement officers were authorized to carry firearms in all areas of State Parks and Forests. Other visitors could still "open-carry" firearms in the majority of the area comprising the State Parks and Forests, but were restricted from carrying the firearms in certain "sensitive areas" identified by the Agencies. These included, *inter alia*, areas such as lodges, offices, bath houses, and public campgrounds.

[5] Volume 21, Issue 8.

published in the *Register of Regulations* on May 1, 2018,[6] and took effect on May 11, 2018.

Eleven days after the new regulations' effective date and within thirty days of publishing, the Plaintiffs filed a complaint seeking a declaratory judgment. The Plaintiffs allege that many of the DNREC regulations amending 7 *Del. Admin. C.* 9201-21.1 (hereinafter "DNREC Regulations") and the DDA regulations amending 3 *Del. Admin. C.* 402-8.8 (hereinafter "DDA Regulations") were unconstitutional and violated several statutory restrictions. In response, the Agencies rely upon information from their public hearings and comment period to demonstrate a sufficient basis under the Administrative Procedures Act to justify the new regulations. The Agencies also emphasize their substantial efforts to comply with the holding of *Bridgeville I.* They maintain that their new regulations comply with the Delaware Supreme Court's decision.

In summary, the challenged final regulations now permit any person with a valid concealed carry permit and present or past law enforcement officers to possess firearms throughout State Parks and Forests. The regulations also delineate designated areas where "open carry" is banned. Other than in those designated areas, the regulations no longer prohibit open carry in State Parks and Forests. The final regulations also permit law enforcement officers to perform background checks of all persons carrying firearms, and to demand persons legally carrying concealed weapons to produce their permits upon request. Finally, the regulations also authorize the Agencies to grant exceptions to both concealed carry requirements and open carry restrictions.

After the parties stipulated to the facts comprising the administrative record, and to a number of other facts, the Plaintiffs moved for summary judgment. The Agencies filed a cross motion for judgment on the pleadings.

---

[6] Volume 21, Issue 11.

Thereafter, the parties stipulated to an expedited briefing schedule and the Court held oral argument on July 20, 2018.

## Standard of Review and Burden of Proof

Plaintiffs seek a declaratory judgment pursuant to 10 *Del. C.* §§ 6501 and 6502 that give the Court the power to "declare rights."[7] When an interested person's[8] rights are affected by a statute, ordinance, contract or franchise, that person "may have determined any question of construction or validity arising under [it], and obtain a declaration of rights, status or other legal relations thereunder."[9] Although the declaratory judgment statute does not expressly address regulations, the Administrative Procedures Act authorizes an aggrieved person to file a declaratory judgment to challenge agency regulations.[10]

The Court may refuse to enter a declaratory judgment when granting such a judgment "will not terminate the uncertainty or controversy giving rise to the proceeding."[11] A central concern accompanying declaratory judgments is to avoid hypothetical questions because judicial resources are limited. The judicial branch's contributions to the legal system is "[interstitial] and … it is required to do so by reason of specific facts that necessitate a judicial judgment."[12] Nevertheless, the purpose of a declaratory judgment "is to settle and to afford

---

[7] *See* 10 *Del. C.* § 6501 (providing that "[e]xcept where the Constitution of this State provides otherwise, courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed. …The declaration may be either affirmative or negative in form and effect, and such declaration shall have the force and effect of a final judgment or decree.").

[8] *See* 10 *Del. C.* § 6513 (providing that "[t]he word 'person,' wherever used in this chapter, shall be construed to mean any person, partnership, joint stock company, unincorporated association or society, or municipal or other corporation of any character whatsoever.").

[9] 10 *Del. C.* § 6502.

[10] 29 *Del. C.* § 10141(a).

[11] 10 *Del. C.* 6506.

[12] *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987).

relief from uncertainty and insecurity with respect to rights, status and other legal relations, and this purpose is to be liberally construed and administered."[13]

The burden of proof in this case, as highlighted by the parties, is a complex amalgamation. Here, Plaintiffs challenge (1) all the regulations as illegal because they allege that they are statutorily preempted, and (2) a portion of the regulations as illegal because they are unconstitutional. Generally, the burden of proof in challenging the legality of regulations rests on the plaintiff.[14] On the other hand, in the context of a challenge to regulations based upon their alleged unconstitutionality, the burden is on the agency to establish their constitutionality.[15]

Regarding statutory challenges to regulations, pursuant to 29 *Del. C.* §10141(e), an agency action under review "shall be presumed to be valid and the complaining party shall have the burden of proving either that the action was taken in a substantially unlawful manner and that the complainant suffered prejudice ... or that the regulation ... was adopted without a reasonable basis on the record or is otherwise unlawful."[16] With regard to a constitutional challenge, the regulations are subject to intermediate scrutiny.[17] In this case, to survive intermediate scrutiny, the Defendants as agencies of the State have the burden to:

> *first*, articulate their important governmental objectives in enacting the Regulations; *second*, demonstrate that the Regulations are substantially related to achieving those objectives; and, *third*, show that the Agencies have not burdened the fundamental right to bear arms in self-defense more than is reasonably necessary to ensure that the asserted governmental

---

[13] 10 *Del. C.* § 6512.
[14] *Baker v. Delaware Dept. of Nat. Resources & Environ'l Control*, 2015 WL 5971784, at *5 (Del. Super. Oct. 7, 2015), *aff'd*, 137 A.3d 122 (Del. 2016) (TABLE).
[15] *Doe v. Wilmington Housing Authority*, 88 A.3d 654, 666 (Del. 2014).
[16] 29 *Del. C.* §10141(e).
[17] *Bridgeville*, 176 A.3d at 656.

6

objectives are met. The Agencies are required to show more than a "general safety concern."[18]

With these burdens in mind, the posture of the case is one of cross-motions for summary judgment. Initially, the Agencies moved for judgment on the pleadings while the Plaintiffs moved for summary judgment. At oral argument, the Agencies conceded that their motion should be considered as one for summary judgment because both parties rely extensively upon factual matters outside the pleadings.[19]

In reviewing a motion for summary judgment, when viewing the facts in the light most favorable to the nonmoving party, the moving party must demonstrate "that there are no material issues of fact still in dispute and that the moving party is entitled to judgment as a matter of law."[20] The mere fact that both parties filed motions for summary judgment "does not act *per se* as a concession that there is an absence of factual issues."[21] However, "where the parties have not presented to the court that there is an issue of material fact, the court shall deem the motion to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motion[s]."[22] Here, based on the stipulated facts and cross motions for summary judgment, it is appropriate for the Court to decide this case as a matter of law.

---

[18] *Id.* (emphasis added).
[19] *See Velocity Exp., Inc. v. Office Depot, Inc.,* 2009 WL 406807, at *2 (Del. Super. Feb 4, 2009) (finding that "Superior Court Civil Rule 12 states that if matters outside of the pleadings are presented and not excluded by the Court, the Court must convert the motion to one for summary judgement."). *See also Appriva Shareholder Litigation Co., LLC v. EV3, Inc.,* 937 A.2d 1275, 1284-85 (Del. 2007) (converting a motion to dismiss into a motion for summary judgment).
[20] *Burkhart v. Davies,* 602 A.2d 56, 59 (Del. 1991).
[21] *United Vanguard Fund, Inc. v. TakeCare, Inc.,* 693 A.2d 1076, 1079 (Del. 1997).
[22] Super. Ct. Civ. R. 56(h); Ct. Ch. R. 56(h).

**This matter is justiciable because both the individual Plaintiff and the organizational Plaintiffs have standing and the action constitutes an actual controversy for purposes of the Declaratory Judgment Act.**

There are a number of requirements for the Court to find a matter to be justiciable. The two requirements for justiciability challenged by the Agencies include the Agencies' claim that the Plaintiffs do not have standing and that the case is not an actual controversy.[23]

**Standing**

The Agencies challenge the standing of both the individual Plaintiff, Mr. Sylvester, and the organizational Plaintiffs. At the outset, the Court recognizes that it has jurisdiction to consider the lawfulness of a regulation promulgated by an agency when an aggrieved party brings an action for declaratory relief.[24] This Court has expressed its preference in these cases for a review on the merits because pre-enforcement review often benefits both those subject to the regulations and those who issue them.[25] Those subject to a contested regulation benefit from pre-enforcement review because their alternative is to make the Hobson's choice between complying with the regulation they believe to be invalid or risking possible sanctions.[26] Those issuing the regulation may also benefit from pre-enforcement review because, if a regulation is found invalid during pre-enforcement review, it may still be revised instead of simply being declared void.[27] In addition, it helps minimize costly and burdensome litigation

---

[23] *See* 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3529 (3d ed. 2008) (summarizing the U.S. Constitutional and prudential requirements for justiciability).

[24] *American Ins. Ass'n v. Delaware Dept. of Ins.*, 2006 WL 3457623, at *2 (Del. Super. Nov. 29, 2006).

[25] *American Auto Mfrs. Ass'n v. Public Service Comm'n of State of Del.*, 1997 WL 718656, at *1 (Del. Super. Jul. 23, 1997).

[26] *American*, 2006 WL 3457623, at *2.

[27] *Id.*

by not forcing agencies to defend the legality of their regulations piecemeal across many separate enforcement actions.

The Court is not clear as to what extent the Agencies challenged the Plaintiffs' standing in *Bridgeville I*. This case follows on the heels of *Bridgeville I* and all parties involved in this case were involved in that case. The Court also recognizes that the Delaware Supreme Court did not expressly address the 30-day filing deadline required by 29 *Del. C.* § 10141.[28] The plaintiffs in that case filed their case well outside the 30-day statutory limit and argued against the constitutionality of decades old regulations. Accordingly, since the Supreme Court decided *Bridgeville I* on the merits, its decision can fairly be read to provide that for a constitutional challenge, the 30-day statutory limit does not apply. In such cases, the regulation can later be challenged through a declaratory judgment action. Although the Delaware Supreme Court also decided *Bridgeville I* on administrative grounds, it did so with a constitutional underlay. On balance, since that case was decided within the last year and involved primarily the same parties, this Court will not contradict the Delaware Supreme Court's implied finding that the parties have standing to challenge these regulations.

Notwithstanding the *Bridgeville I* decision, the Agencies argue that Mr. Sylvester has not sustained an injury in fact because he is not an "aggrieved person." Independent of the Delaware Supreme Court's implied finding on the issue, the Court separately finds that Plaintiffs have standing to bring a claim for declaratory relief. Plaintiffs filed this case on May 22, 2018, twenty-two days after the regulations were published on May 1, 2018, and thus within the 30-days required by statute. An individual or organization is "aggrieved" for purposes of the statute when the individual or organization is subject to the regulations.[29] The

---

[28] See 29 *Del. C.* § 10141(d) (prohibiting judicial review of a regulation after 30 days from when it was published).
[29] *Id.* at *10.

party need not have suffered any injury in fact before having the ability to challenge the regulations.[30] In fact in *Doe v. Wilmington Housing Authority*,[31] the Delaware Supreme Court held that a plaintiff does not even need to own a firearm to have standing to seek redress from a violation of his or her constitutional right.[32]

In the analogous federal context, the Federal Court of Appeals for the Seventh Circuit recognized it as "well-established" that pre-enforcement challenges of regulations are within the purview of Article III of the United States Constitution for individual standing purposes.[33] As the Seventh Circuit noted, an individual plaintiff need not violate a regulation and risk prosecution in order to challenge it.[34] The very "existence of a statute [or regulation] implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing."[35]

In the case at hand, Mr. Sylvester has individual standing because he is sufficiently aggrieved under the law. Mr. Sylvester, as a resident of Pennsylvania who frequents Delaware State Parks and Forests, desires to bring his firearms into the Parks and Forests, and is therefore subject to the disputed regulations. He participates in rifle competitions in the State of Delaware and but for the regulations at issue that prohibit firearms in the State's camping areas and lodges, he would avail himself of the overnight accommodations available in State Parks and Forests. The Agencies' regulations prevent him from keeping his rifle in a lodge, tent or campground while he is *en route* to a rifle competition and thus the regulations substantially affect his Delaware Constitutional rights. If Mr.

---

[30] *Id.*

[31] *Doe v. Wilmington Housing Authority*, 880 F.Supp.2d 513 (D. Del. 2012) (*rev'd on other grounds*).

[32] *Id.* at 522.

[33] *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011).

[34] *Id.* (citing *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010)).

[35] *Id.* at 695-696, (citing *Bauer v. Shephard*, 620 F.3d 704, 708 (7th Cir. 2010)).

Sylvester were to keep his firearms in a restricted area, such as a tent or lodge, he would be subject to criminal sanctions.[36]

The Agencies also contest the organizational Plaintiffs' standing notwithstanding *Bridgeville I.* With regard to organizational standing, both parties rely upon *Oceanport v. Wilmington Stevedores.*[37] There, the Delaware Supreme Court held that an organization may sue on behalf of its members if (1) the interests to be protected by the suit are germane to the organization's purpose; (2) neither the claim asserted nor the relief requested requires the participation of individual members; and (3) the organization's members would otherwise have standing.[38]

Determining whether an organization's interests are germane for purposes of this test is an undemanding standard that requires only "mere pertinence between the litigation subject and organizational purpose."[39] This standard only bars those whose litigation goals and organizational purposes are totally unrelated.[40] The Delaware State Sportsmen's Association is an organization that promotes and protects the interests of gun owners in and around Delaware. Its members include competitive shooters, casual recreational shooters, hunters, collectors and persons with interests in personal and home protection. Similarly, the Bridgeville Rifle and Pistol Club conducts rifle and pistol sporting

---

[36] Plaintiffs assert that if Mr. Sylvester were to carry a concealed firearm without a license, it would be a Class D felony pursuant to 11 *Del. C.* § 1442. The new regulations, at issue here, do not address Mr. Sylvester's right regarding concealed carry. If he has no permit to do so, these regulations do not affect any of his rights or cause him to be subject to any greater prosecution for carrying a concealed deadly weapon. However, the Agencies assert correctly that a violation of the firearms regulations before the Court would be classified as an "Environmental D" violation pursuant to 7 *Del. Admin. C.* Ch. 9201, and Parks Rule 25.1.1 and that a violator would face a fine of $50-$100 for a first offense and a $100-$500 fine for subsequent offenses within five years. In any event, Mr. Sylvester would face potential sanctions sufficient to give him individual standing.

[37] *Oceanport v. Wilmington Stevedores,* 636 A.2d 892 (Del. 1994).

[38] *Id.* at 902 (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333 (1977)).

[39] *Id.*

[40] *Id.*

11

competitions and its members often seek to use facilities in Delaware State Parks and Forests. Pursuant to the DNREC and DDA regulations at issue, the organization's members who do not have concealed carry permits or are not retired law enforcement officers are prohibited from using camping and lodging facilities while possessing their firearms. The organizational interests to be protected in this case, therefore, include the right to bear arms for recreational and self-defense purposes. Thus, given the Plaintiff organizations' purposes to protect and promote such rights, the Court finds the first prong of the test to be satisfied.

The organizational Plaintiffs also meet the second prong because neither the claim asserted nor the relief requested requires their individual members' participation. While Mr. Sylvester is included among the Plaintiffs in this case, and he himself satisfies individual standing, he is not a required party for either the claim or for the relief requested. Furthermore, no individual members of the organizations seek monetary damages and they are not required to participate in the case on an individual basis for the Court to determine if the regulations violate the Delaware Constitution.

The third prong for the test for organizational standing is easily satisfied. Mr. Sylvester, as a member of the organizations, has standing in this case. Thus, many of the other organizational members like him who participate in shooting competitions will also satisfy the requirements for individual standing. Since the three *Oceanport* requirements are satisfied, both Bridgeville and Sportsmen have organizational standing.

The cases relied upon by the Agencies in disputing the Plaintiffs' standing are distinguishable. For instance, the Agencies rely on *Stevenson v. Delaware Dept. of Nat. Resources*.[41] That case is distinguishable because those plaintiffs

---

[41] *Stevenson v. Delaware Dept. of Nat. Resources*, 2018 WL 3134849, at *16 (Del. Super. Ct. Jun 26, 2018).

could not establish a concrete injury that could be redressed by a favorable decision.[42] The injury to those plaintiffs was merely "conjectural or hypothetical."[43] As opposed to the matter at hand, the plaintiffs in *Stevenson* failed to establish standing with data, research and expert opinions in order to prove their injury under regulations regulating greenhouse gases. The challenge to the regulation in *Stevenson* was based not on a constitutional issue, but rather on alleged non-compliance with statutory requirements and the financial harm that the non-compliance allegedly caused the plaintiffs.[44] In this case, the facts are much simpler and expert opinion and data are not necessary to evaluate and to challenge regulations that allegedly violate a fundamental constitutional right. Finally, as discussed above, the injury to the Plaintiffs is not "conjectural or hypothetical" and it can be redressed by a favorable decision.

### Actual Controversy

The second requirement for justiciability raised by the Agencies is whether this case involves an actual controversy. The Agencies argue that this action does not, while Plaintiffs argue that it does. At the outset, as with the standing issue, this suit is as much of an actual controversy as the claim in *Bridgeville I*. There, the Delaware Supreme Court impliedly found the case to be an actual controversy before issuing its decision. Since the Agencies evidently did not contest this issue in the first instance, but do now, the Court will address it.

The Delaware Supreme Court has articulated the prerequisites for an "actual controversy," for purposes of declaratory judgments, as follows:

> (1) [i]t must be a controversy involving the rights or other legal relations of the party seeking de[c]laratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between

---

[42] *Id.*
[43] *Id.* at *12.
[44] *Id.* at *1.

13

parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination.[45]

Applying these factors, the case is an actual controversy and does not involve a hypothetical question. First, the regulations at issue substantially impact the rights of both the individual and organizational Plaintiffs as provided in the previous standing discussion. Second, the Plaintiffs assert their rights against the Agencies, who likewise oppose the claim because they enacted the regulations in dispute. Third, the Plaintiffs and the Agencies have interests that are real and adverse. Namely, if Mr. Sylvester were to violate the regulations, he could face a potential criminal sanction. On the other hand, DNREC and DDA have expended considerable resources in drafting these regulations. They would have to invest even more resources to potentially redraft them piecemeal after future narrow court decisions addressing singular issues.

Fourth and finally, the issue is ripe for judicial determination. The ripeness doctrine is invoked to determine whether a dispute has matured to a point that it warrants a decision.[46] Ripeness of an issue is essential for the matter to be justiciable, because "[u]nless a controversy is 'ripe for judicial determination,' a court may simply be asked to render an advisory opinion."[47] A matter is ripe when "[t]he state of a dispute has reached, but has not passed the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made."[48]

This issue must be evaluated by assessing whether "given the facts at hand, a sufficient threat of enforcement exists such that judicial review is warranted."[49]

---

[45] *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).
[46] 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3532 (3d ed. 2008).
[47] *Baker*, 2015 WL 5971784, at *9.
[48] *Black's Law Dictionary* (10th ed. 2014).
[49] *Baker*, 2015 WL 5971784, at *9.

Here, the regulations became effective on May 11, 2018, and are already being enforced. The ripeness of a matter is determined by using practical judgment in balancing whether "postponing review until the question arises in some more concrete and final form, [is] outweighed by the interests of those who seek relief from the challenged action's immediate and practical impact upon them."[50] Declining Court review in this case would mean that individuals like Mr. Sylvester, and members of the organizational Plaintiffs would have to risk criminal sanctions or abide by regulations they believe to be unconstitutional. This is the Hobson's choice that, in fairness, is inappropriate. The Plaintiffs are entitled to seek review of the challenged regulations.

### Delaware statutes have not completely preempted the field of firearms regulation.

In *Bridgeville I*, the Delaware Supreme Court's holding singularly answers the question at hand; the Agencies' recently promulgated regulations were not preempted *per se* by Delaware statutes or the Delaware Constitution. There, the Court held that DNREC and DDA's regulations violated the Delaware Constitution by broadly banning firearms in State Parks and Forests. The Court separately held that they violated administrative law requirements by promulgating unconstitutional regulations.[51] The Court, however, did not hold that the Agencies lacked authority to enact firearm related regulations in any instance.[52] In fact, the Delaware Supreme Court had previously recognized in *Doe v. Wilmington Housing* Authority that "[s]ome regulation of possessing firearms ... could pass intermediate scrutiny, and thus governmental agencies are not prohibited from enacting firearm regulations."[53]

---

[50] *Id.* (citing *Nichols v. State Coastal Zone Indus. Control Board*, 2013 WL 1092205, at *3 (Del. Super. Mar. 14, 2013), *aff'd*, 74 A.3d 636 (Del. 2013)).

[51] *Bridgeville*, 176 A.3d at 661.

[52] *Id.*

[53] *Doe*, 88 A.3d at 668 (holding that the Wilmington Housing Authority, a nonprofit agency in the state of Delaware that provides housing to low-income individuals and families, could

Notwithstanding this recognition in *Doe* and *Bridgeville I*, the Plaintiffs argue that the Agencies have no authority to enact or enforce the disputed regulations because the field has been preempted by the General Assembly. DNREC may promulgate and enforce regulations pursuant to 7 *Del. C.*§ 6010, while DDA has the power to promulgate rules and regulations pursuant to 3 *Del. C.* § 101. Furthermore, DNREC has the authority to both dedicate and administer State Parks, under 7 *Del. C.* § 4701. Likewise, DDA has similar authority over State Forests pursuant to 3 *Del. C.* § 1001. Nevertheless, Plaintiffs argue that despite these enabling statutes, neither agency has the authority to restrict the possession of firearms in State Parks and Forests through regulations because such regulations would be inconsistent with a number of Delaware statutes.

For instance, Plaintiffs rely significantly on the Delaware Code provision prohibiting "municipal governments" from enacting firearm restriction ordinances that restrict firearm use.[54] At the outset, the State and its agencies are not addressed by that section. Furthermore, any agency or political subdivision may adopt ordinances or regulations that affect similar areas to those addressed by legislation as long as they do not conflict with a law passed by the General Assembly.[55] Where there is a conflict between the statute and a regulation, the statute will always prevail.[56] In this regard, the test in preemption analysis is whether the state statute was intended to be exclusive.[57] Legislative intent to make a statute exclusive may be either express or implied.[58]

---

regulate the possession of firearms on its premises if those regulations passed intermediate scrutiny).

[54] *See* 22 *Del. C.* § 111(a) (Providing that "[t]he municipal governments shall enact no law, ordinance or regulation prohibiting, restricting or licensing the ownership, transfer, possession or transportation of firearms or components of firearms or ammunition except that the discharge of a firearm may be regulated ...").

[55] *See Cantinca v. Fontana*, 884 A.2d 468, 473 (Del. 2005) (referring to state statutes and municipal ordinances as opposed to agency regulations).

[56] *Id.*

[57] *Id.*

[58] *Id.*

16

The Delaware Supreme Court in *Cantinca v. Fontana*[59] set forth the benchmark for evaluating these two preemption avenues as follows:

> *Express* exclusivity intent exists where the statutory text or legislative history explicitly provides or demonstrates that the state statute is intended to replace or prevail over any pre-existing laws or ordinances that govern the same subject matter. *Implied* exclusivity intent may be found where the regulations are inconsistent; for example, where a state statute prohibits an act that is permitted by a local ordinance to be inconsistent by implication, however, the local ordinance must hinder the objectives of the state statute.[60] (emphasis added).

In this case, there was no express preemption of the Agencies' power to adopt regulations regulating gun use. While Article I, Section 20 of the Delaware Constitution gives citizens the "right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use," it does not expressly preempt any other rules, regulations or ordinances.[61] Furthermore, there is no statute prohibiting state agencies from adopting regulations regarding firearm possession as there is with *municipalities* pursuant to 22 *Del. C.* § 111.

There was also no implied preemption in this case. While the Court acknowledges the significant restrictions placed by the General Assembly on the possession and use of firearms,[62] these restrictions do not demonstrate that the

---

[59] 884 A.2d 468 (Del. 2005).

[60] *Id* at 473-474.

[61] Del. Const. art. I, § 20. *See* 11 *Del. C.* Ch. 5, subchapter VII, subpart E (where the General Assembly passed a significant amount of legislation regulating firearm use); *see also Bridgeville*, 176 A.3d at 658 (recognizing that there "certainly could be" sensitive areas in State parks and forests where firearms may be restricted and thus regulated).

[62] *See, e.g.,* 11 *Del. C.* § 1444 (restricting sale, use and possession of sawed-off shotguns, machine guns and other destructive weapons); 11 *Del. C.* § 1445 (prohibiting the sale or transfer of a firearm to a minor); 11 *Del. C.* §§ 1447, 1447A (criminalizing the possession of a firearm during the commission of a felony); 11 *Del. C.* § 1448 (prohibiting certain persons from owning, using or purchasing firearms); 11 *Del C.* § 1448A (requiring a criminal background check prior to the purchase or sale of a firearm); 11 *Del. C.* §§ 1454, 1455 (criminalizing the act of giving a firearm to a prohibited person or engaging in a sale or

General Assembly intended to impliedly occupy the entire field. Namely, the statutes that Plaintiffs rely upon are all narrowly tailored to address specific issues, such as prohibiting the sale of firearms to minors or further criminalizing the possession of a firearm during a felony. Nothing about regulating those separate, narrow subjects, demonstrates the General Assembly's intent to exclusively occupy the field of firearm regulation.

While the Agencies may only act within the confines of the legislative acts creating them,[63] they also derive authority to promulgate regulations from those same acts. Both Agencies have broad statutory power delegated to them by the General Assembly to promulgate regulations.[64] Each Secretary also has broad general authority to administer their agencies.[65] Since DDA administers State Forests and DNREC administers State Parks, it follows that they have broad authority to regulate conduct within those areas. The Agencies are not prohibited from regulating firearm use within their respective areas simply because the General Assembly has extensively regulated firearms through statutes. Thus, while the Court finds for the reasons discussed below that some of the regulations at issue are unconstitutional, the Agencies are not prohibited from adopting firearm regulations because the field is preempted. Namely, *Bridgeville I*'s holding recognizes that the Agencies may promulgate firearm regulations so long as they are not inconsistent with the laws of Delaware, and also pass intermediate scrutiny.

---

purchase of a firearm on behalf of a person not legally allowed to sell or purchase firearms); 11 *Del. C.* § 1456 (criminalizing unlawfully permitting a minor access to a firearm).

[63] *Diamond State Liquors v. Delaware Liquor Comm'n*, 75 A.2d 248, 253 (Del. Ct. Gen. Sess. 1950).

[64] 3 *Del. C.* § 101(3); 29 *Del. C.* § 8003(7); 29 *Del. C.* § 8103(8); 7 *Del. C.* § 4701(4); 7 *Del. C.* § 6010(a).

[65] *See* 3 *Del. C.* § 101; 7 *Del. C.* Ch. 60 (granting the Secretary of the DDA the authority to issue regulations); *see also* 29 *Del. C.* § 8003; 29 *Del. C.* § 8103 (granting the Secretary of DNREC the authority to issue regulations).

### Some of the regulations defining sensitive areas are unconstitutional in light of *Bridgeville I*.

The Agencies assert that all of their regulations are lawful. In the alternative, they argue that if the Court disagrees, it should examine the regulations individually and find any unconstitutional portions to be severable. In the Agencies' parlance, they request an *ala carte* review. Plaintiffs also argue, based on their *constitutional* challenges, that the Court should examine the regulations line by line. Since the Plaintiffs' argument regarding total preemption is without merit, the Court will examine the challenged regulations from both DNREC and DDA line by line as requested.

Article I, Section 20 (hereinafter "Section 20") of the Delaware Constitution creates the rights to balance against the Agencies purposes in regulating firearm use in State Parks and Forests. As the Delaware Supreme Court recognized, Section 20 provides broader protection regarding gun rights than the Second Amendment to the United States Constitution.[66] *Bridgeville I* and *Doe v. Wilmington Housing Authority* turned on a Delaware Constitutional provision. Because that provision provides greater protection then the Second Amendment, the Court will not address Plaintiffs' Second Amendment arguments.

In *Doe*, the Delaware Supreme Court confirmed that Section 20, though passed in 1987, confirmed the long-standing rights "of responsible citizens to lawfully carry and use firearms in our state."[67] In recognizing this right, our Supreme Court confirmed again that Delaware is an "open carry" state.[68] This right to bear arms includes the right to do so for purposes of hunting, recreation and protection of self and family both inside and outside the home.[69]

---

[66] *Bridgeville*, 176 A.3d at 636.
[67] *Doe*, 88 A.3d at 663.
[68] *Id.*
[69] *Id* at 665.

19

Although Section 20 preserves greater rights greater than those preserved in the Second Amendment, the right to public carry for self-defense is not absolute.[70] In applying the standard set forth in *Doe*, the Delaware Supreme Court in *Bridgeville I* confirmed that intermediate scrutiny must be applied when firearm restrictions are not a complete ban.[71] Moreover, the Supreme Court recognized that the "rights of Delaware citizens to defend themselves with firearms is especially critical 'when the intervention of society on their behalf may be too late to prevent injury.'"[72]

A primary area of contention includes the Agencies' findings regarding sensitive areas that they refer to as "designated areas." At the outset, the new regulations permit persons with concealed carry permits and law enforcement officers to possess firearms throughout the State Parks and Forests, including in designated areas. However, the new regulations prohibit open carry or possession of firearms in the designated areas if a person is not a member of law enforcement or is not a concealed carry permit holder. Accordingly, the challenged regulations restrict only open-carry within these designated areas.

Both Agencies promulgated similar, parallel regulations, so they will be jointly addressed by the Court. First, DNREC promulgated the following definition of "designated areas":

> 21.1.1 Designated areas shall include park offices, visitor centers, nature centers, bathhouses, restaurants and snack bars, stadiums and facilities while used for sporting events, concerts, and festivals, museums, zoos, stables, educational facilities, dormitories, playgrounds, camping areas, swimming pools, guarded beaches, and water parks, and shall be identified by appropriate signage.[73]

---

[70] *Id* at 667.
[71] *Bridgeville*, 176 A.3d at 654-55.
[72] *Id.* at 659.
[73] 7 *Del. Admin. C.* 9201-21.1.1.

20

Likewise, DDA promulgated the following definition of "designated areas":

> 8.8.1 Designated areas shall include State Forest Offices, education centers, and lodges, and shall be identified by appropriate signage.[74]

While the Plaintiffs originally argued in their briefing that all designated areas set forth in the regulations above were unconstitutional, they narrowed their constitutional challenge during oral argument to (1) camping areas in DNREC Regulation 21.1.1 and (2) lodges in DDA Regulation 8.8.1. Separately, while cabins were not included as designated areas in either set of regulations, the Plaintiffs repeatedly addressed cabins in their briefing and at oral argument. Plaintiffs no longer contest that areas such as bathhouses, stadiums, museums and offices qualify as sensitive. Based on the Plaintiffs' representations at oral argument, the Court deems all constitutional challenges regarding those areas to be withdrawn.

### The administrative record does not support a finding that the Agencies' designation of camping areas as sensitive survives intermediate scrutiny.

In *Bridgeville I* the Delaware Supreme Court invalidated the Agencies' blanket restrictions on firearms and held that:

> [t]he limited ability to have a hunting rifle or shotgun while engaged in a controlled hunt on State park or forest land does not fulfill and cannot substitute for **the people's right to have a firearm while camping overnight in a State park** . . ..The Regulations not only unduly burden **that Constitutional right**, they eviscerate it all together.[75]

The Agencies' argument that this portion of the decision was qualified to apply to only complete restrictions of firearms is not availing. In this vein, the

---

[74] 3 *Del. Admin. C.* 402-8.8.1.
[75] *Bridgeville*, 176 A.3d at 638 (emphasis added).

Agencies argue strenuously and persuasively regarding the differences between our State Parks and Forests and the expansive forests and parks in the west where camping is not segregated to controlled areas. Nevertheless, the above quoted language in the *Bridgeville I* decision signals strongly that prohibiting the right to possess a firearm while camping overnight would face a high hurdle in passing intermediate scrutiny. In fact, the language quoted above goes so far as to actually define the ability to possess firearms at a camp site as being *within the definition* of the fundamental right at issue.

While the Delaware Supreme Court in *Bridgeville I* held that there "certainly could be some 'sensitive' area in State Parks and State Forests where the carrying of firearms may be restricted," the Agencies must justify their decision to delineate sensitive areas so as not to infringe on Section 20 rights.[76] In *Bridgeville I*, the Court gave the following guidance to evaluate whether an area in a State Park or Forest could constitute a sensitive area warranting such restrictions:

> [i]n contrast to a permissible sensitive place such as a courthouse, where visitors are screened by security, most State Parks and State Forests do not have controlled entry points. One can easily enter a State Park or State Forest with a weapon—either intentionally or by inadvertently wandering across a State Park boundary while exercising the right to open carry …. Whereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders, making the need to defend oneself with a personal firearm seemingly less acute, State Parks and State Forests are relatively remote and, for example, have less than thirty rangers to police Delaware's entire State Parks.[77]

The Delaware Supreme Court's guidance quoted above can be distilled to the following three factors that the Court must evaluate in determining if an area's

---

[76] *Id.* at 658.
[77] *Id.* at 659.

designation as sensitive satisfies intermediate scrutiny. Namely, these factors include whether the area is: (1) one with a controlled entry point; (2) where visitors are screened by security; and (3) where an area is supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders.[78]

The Court considered the arguments of the Agencies and has thoroughly reviewed the Agencies' rulemaking record. The Agencies articulated the basis for their factual findings as required by 29 *Del. C.* §10118. Included in the Administrative Procedures Act are agency obligations to provide a "[b]rief summary of [their] findings of fact with respect to the evidence and information [of record]"[79] The Agencies' decisions to adopt rules or regulations must "be supported by [their] findings as to the evidence and information received."[80]

A review of this record demonstrates that the Agencies worked diligently during their rulemaking proceedings. In advocating that their decision to include camping areas as a sensitive area survives intermediate scrutiny, the Agencies emphasize that the designated areas make up less than one percent of the total area of the State Parks and Forests and that firearms are still permitted in the other ninety-nine percent. While the Court appreciates that argument, it does not find it wholly persuasive, since the one percent of the State Parks and Forests that the firearms are banned are the parts where many visitors spend much of their time. Moreover, that argument does not address the factors the Agencies should have addressed when evaluating camping areas. Despite the regulations' prohibition against firearms in only small geographical sections under *Bridgeville I*'s reasoning, the burden it places on visitors in camping areas is still substantial.

---

[78] *Id.*
[79] 29 *Del. C.* § 10118(b)(2).
[80] *Id.* at § 10118(b)(3).

23

The Agencies, while arguing the appropriateness of their designation and emphasizing the expansive public record, do not point to evidence or facts found during their rulemaking process that justify designating camping areas as sensitive areas. The record includes generalized studies regarding gun safety. However, nothing within those studies addresses why a camp site is a sensitive area. Counsel for the Agencies filed "Legal Response Memoranda" that included the only area in the record articulating why camping areas should be considered sensitive. It provides legal arguments, not evidence, that (1) they are "contained spaces", (2) not remote but rather in areas regulated by permit; and (3) that permitting firearms in camp sites would present unacceptable risks to children. This legal argument from the Agencies offered in support of designating camp sites as sensitive, however, is unsupported by evidence of record.

The Court has reviewed the summary of studies provided by the Giffords Center to Prevent Gun Violence and Giffords Law Center's comments submitted to the hearing officer. Neither the summarized studies nor the comments on the proposed regulations address camping areas. They do address gun imposed dangers to children in crowded areas and reference increased stress placed upon children in areas where children frequent. In this sense, the studies do support, in part, the Agencies' governmental objectives when designating areas such as public beaches, resource centers, and bathhouses as sensitive. In contrast, the studies, as with the remainder of the record, do not address how camp sites have the above described attributes.

In determining whether the record substantiates that camping areas are sensitive areas, the Court recognizes that camping areas have no controlled entry points other than a reservation check-in site. While there may be a gatekeeper's shed at the entrance to the State Parks, campers and visitors are not screened by security in any manner. As the Supreme Court noted in *Bridgeville I*, anyone could stumble into a camping area with a firearm without park personnel's

24

knowledge.[81]    The Agencies' arguments are conclusory with regard to the controlled entry point factor.

Camp sites are also not monitored by law enforcement. As the Delaware Supreme Court recognized in *Bridgeville I*, there are approximately thirty DNREC law enforcement officers statewide.[82]    As was also emphasized in *Bridgeville I*, DDA Hunting and Rules and Regulations specifically stress that in State Forests, there is *no* protection available to campers, stating that "[c]amping is at your own risk" and that "there is no after-hours, nighttime or weekend security."[83]    In many instances, the camping areas are located miles from the nearest town and it would take law enforcement and emergency personnel a substantial time to reach the camping area in an emergency. Accordingly, with regard to this factor, the Agencies' designation of camping areas as sensitive does not pass intermediate scrutiny.

To satisfy intermediate scrutiny, the government must articulate important governmental objectives, and then demonstrate that the regulations are substantially related to achieving those objectives without burdening the fundamental right to self-defense more than is reasonably necessary.[84]    While the Agencies claim that these regulations will make the State Parks and Forests safer, they still rely upon only a general safety concern to demonstrate an "important governmental objective."[85]    Even assuming that the governmental objective was sufficient to meet the intermediate scrutiny test, there is no evidence in the record in the Agencies' rulemaking proceedings that demonstrates that the regulations are substantially related to achieving this objective. Moreover, there is simply no

---

[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.* at 656.
[85] *Id.*

25

evidence in the rulemaking record regarding any meaningful security or controlled entry points in camping areas.

Finally, by banning firearms in camping areas, the regulations burden the fundamental right to bear arms in self-defense more than is reasonably necessary. *Bridgeville I* recognized the need for protection of self and family *while camping in a state park overnight* as a fundamental right recognized by Section 20. The effect of including camp sites within sensitive areas forces State Park and Forest visitors to give up their right to self-defense in order to camp overnight in those areas. The right for self-protection, as recognized by the Delaware Supreme Court, is unduly burdened when an overnight guest is banned from possessing his or her firearm "while camping overnight in a State Park."[86] Accordingly, this portion of the challenged regulations does not pass intermediate scrutiny.

### DDA's designation of lodges as sensitive areas does not pass intermediate scrutiny.

Similarly, the Agencies' record does not demonstrate that designating the lodge at Redden Forest as a sensitive area passes the required scrutiny.[87] In fact, the administrative record is devoid of evidence supporting that the lodge is a sensitive area. Namely, as conceded at oral argument, there is no controlled entry point for the lodge or even at the forest entrance point itself. Reservations are accepted on line for self check-in. Furthermore, there is not a gatekeeper shed similar to the ones located at the camping areas. This means that no visitors are screened by security when they enter the Forest to stay in the lodge. Moreover, unlike in State Parks controlled by DNREC, DDA which controls the lodge and administers the Forest, has *no* security staff that patrols the area. Finally, the entrance to the Forest is a significant distance from the lodge, making it, at a

---

[86] *Id.* at 638.

[87] The regulations designate "lodges" as sensitive areas. No lodge other than a lodge located at Redden Forest has been identified by the parties, however.

minimum, not a place providing easy access to law enforcement and emergency personnel.

In applying intermediate scrutiny, first, the important governmental objectives when enacting the regulations that the Agencies refer to are once again no more than a general safety concern. Second, there is no evidence of record that these regulations would aid in this governmental objective. As with camping areas, these regulations burden the fundamental right to self-defense more than is reasonably necessary because the Agencies' fail to justify in any way their selection of the lodge as a sensitive area. Finally, the rulemaking record is devoid of any evidence supporting that the lodge has (1) controlled entry points, (2) security screening, or (3) easy access by law enforcement personnel. For these reasons, the lodge is not an area akin to a school, court house or government office that could qualify as a sensitive area. As with camping areas, the Agencies' designation of lodges as sensitive areas does not survive intermediate scrutiny.

**Plaintiffs argued that the Agencies were not justified in designating cabins as sensitive areas; since cabins are not identified in the regulations as designated areas the Court need not address them.**

Plaintiffs fairly raised challenges in their briefing to more than just camping areas and lodges. They initially challenged all of the designated areas. They also challenged cabins and other overnight accommodations that were not specifically mentioned in the regulations. At oral argument, Plaintiffs narrowed their constitutional challenge to camping areas and lodges. In doing so, they conceded that areas such as bathhouses, offices, education centers, and guarded beach areas are appropriately deemed "sensitive." Accordingly, the Court will not address whether the Agencies' decisions to designate them to be sensitive areas survive intermediate scrutiny. Furthermore, with regard to cabins in State Parks or Forests, the Court will not address what has not been addressed in the regulations.

27

**The Agencies' regulations that permit identification and permit checks without reasonable, articulable suspicion of illegal activity are facially unconstitutional.**

Analyzing another portion of the newly promulgated regulations requires consideration of the protections of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 6 of the Delaware Constitution. Namely, some of the challenged regulations permit automatic background checks whenever requested by law enforcement officers. The Plaintiffs challenge those regulations and argue that this unfettered discretion infringes on State Park and Forest visitors' rights under the Fourth Amendment. Both Agencies promulgated parallel regulations, so they will be jointly addressed by the Court.

First, DNREC promulgated the following regulation authorizing identification checks as follows:

> 21.1.7 Any person possessing a firearm shall display identification upon request, sufficient to enable a law enforcement officer to undertake a background check.[88]

Separately, DNREC also granted similar power to law enforcement officers pursuant to the following regulation:

> 21.1.4 Delaware residents holding an active current permit to carry a concealed deadly weapon may carry a firearm within areas administered by the Division, including designated areas, *provided that the permit shall be produced upon request.* ... (emphasis added)[89]

DDA promulgated the following regulation, identical to 21.1.7:

> 8.8.6 Any person possessing a firearm shall display identification upon request, sufficient to enable a law enforcement officer to undertake a background check.[90]

---

[88] 7 *Del. Admin. C.* 9201-21.1.7
[89] 7 *Del. Admin. C.* 9201-21.1.4
[90] 3 *Del. Admin. C.* 402-8.8.6

DDA likewise granted law enforcement officers parallel authority as provided in its regulation identical to 21.1.4 above:

> 8.8.3. Delaware residents holding an active current permit to carry a concealed deadly weapon may carry a firearm within areas administered by the Department, including designated areas, *provided that the permit shall be produced upon request.* … (emphasis added)[91]

Plaintiffs argue that sections 21.1.7 and 8.8.6 (as well as the clauses in 8.8.3 and 21.1.4 emphasized above) give law enforcement officers the ability to demand that visitors "display identification upon request" and are therefore unconstitutional on their face. The Fourth Amendment, as incorporated through the Fourteenth Amendment, guarantees the right of the people "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."[92] The purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."[93] Plaintiffs argue that since these regulations require no reasonable articulable suspicion that the person to be searched committed a crime, they authorize unconstitutional detentions.

A facial challenge is an attack on a statute or regulation itself as opposed to a particular application of that statute or regulation.[94] To succeed in a facial attack, Plaintiffs must show that "no set of circumstances exist under which the [regulations] would be valid,"[95] or that the regulations lack any "plainly legitimate sweep."[96] A facial challenge to an act or regulation is the most difficult challenge to mount successfully.[97] The United States Supreme Court has

---

[91] 3 *Del. Admin. C.* 402-8.8.3
[92] U.S. Const. amend. IV.
[93] *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967).
[94] *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2449 (2015).
[95] *United States v. Salerno*, 481 U.S. 739, 745 (1987).
[96] *United States v. Stevens*, 559 U.S. 460, 472 (2010), (citations omitted).
[97] *Salerno*, 481 U.S. at 745.

nevertheless permitted facial challenges to proceed under a diverse array of constitutional provisions, including the First Amendment, Second Amendment, and the Due Process Clause of the Fourteenth Amendment.[98]

While mere police or law enforcement questioning does not constitute a seizure for purposes of the Fourth Amendment,[99] the regulations permit law enforcement officers to do more than merely ask questions. Under the challenged regulations, law enforcement officers can request any visitor to display his or her identification or permit and then detain that visitor for a period of time sufficient to conduct a background check. As the United States Supreme Court recognized in *Brown v. Texas*, when an officer detains a person for purposes of requiring a person to identify himself or herself, the officer has performed a seizure subject to the requirements of the Fourth Amendment.[100] It is termed an "investigatory stop." Since the visitor required to produce identification will be stopped "by means of physical force or show of authority," his or her liberty has been restrained and a stop and a search for purposes of the Fourth Amendment occurs.[101] When law enforcement officers detain park visitors and require that they produce identification or permits, they perform a seizure of the visitor's person subject to the requirements of the Fourth Amendment because the Fourth Amendment applies to "all seizures of a person, including seizures that involve only a brief detention short of a traditional arrest."[102]

These regulations give unfettered discretion to stop State Park and Forest visitors, question them and require identification without requiring a scintilla of evidence of criminal activity. In this regard, Delaware's detention statute, 11 *Del. C.* § 1902, recognizes two important components of search and seizure law. First,

---

[98] *Patel*, 135 S.Ct. at 2449.

[99] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

[100] *Brown v. Texas*, 443 U.S. 47, 50 (1979).

[101] *Moore v. State*, 997 A.2d 656, 663 (2010).

[102] *Brown*, 443 U.S. at 50.

it recognizes the fact that a demand to produce identification constitutes a *Terry* level detention.[103] Second, its reference to the "reasonable grounds" requirement to demand identification is equivalent to the requirement that an officer have reasonable articulable suspicion of criminal conduct before requiring persons to produce identification.[104]

A recent United States Supreme Court decision supports the Court's holding in a case where the Court found a facial challenge to an ordinance authorizing warrantless searches to be appropriate.[105] In *City of Los Angeles, Calif. v Patel*, the Supreme Court found that a Los Angeles Municipal Code provision facially violated the Fourth Amendment because it forced hotels to maintain records of their guests and to make those records "available to any officer of the Los Angeles Police Department for inspection" upon demand.[106] When the Court applied the facially unconstitutional test to determine if the law is unconstitutional in all of its applications, it emphasized that it "considers only applications of the statute in which it actually authorizes or prohibits conduct."[107] Thus, when addressing a facial challenge to a statute that authorizes warrantless searches, the focus is only on searches that the law authorizes, not those searches for which the law is irrelevant, i.e. searches that did not require a warrant in the first place.[108] In that case, the Court held the municipal code at issue was facially

---

[103] *See* 11 *Del. C.* § 1902 (a) (providing that any person stopped based on an officer's reasonable ground to suspect that he or she is involved in criminal activity, must "give identification" if requested, or be subject to further detention.).

[104] *Id.*

[105] *Patel*, 135 S. Ct at 2449.

[106] *Id.* at 2447.

[107] *Id.* at 2451.

[108] *Id.* To illustrate their point, the Court used an example from *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). There "the Court struck down a provision of Pennsylvania's abortion law that required a woman to notify her husband before obtaining an abortion. Those defending the statute argued that facial relief was inappropriate because most women voluntarily notify their husbands about a planned abortion and for them the law would not impose an undue burden. The Court rejected this argument, explaining: The '[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it

unconstitutional because it violated the Fourth Amendment and that the hotel owners must be "afforded an *opportunity* to have a neutral decision maker review an officer's demand to search the registry before he or she faces penalties for failing to comply."[109]

In the present case, a lower level of justification is needed for an investigatory stop than the probable cause required for a warrant in *Patel*. Nevertheless, the regulations at issue are similar to the municipal code examined in *Patel* because the regulations give law enforcement officers in State Parks and Forests the authority to stop individuals without reasonable articulable suspicion of criminal activity. The Agencies allege that these regulations will only be used by law enforcement officers when they observe a firearm within a designated area and thus would have a reasonable articulable suspicion to ask for identification. Officers, however, would have the right to do that without the regulation. As *Patel* makes clear with regard to facial challenges, the Court need not look at the circumstances in which a search is already authorized by sufficient evidence of criminal activity, but at those where it is not. The searches that must be examined are searches where there is *not* reasonable articulable suspicion of criminal activity.

A final line of cases also support finding these regulations to be facially unconstitutional. Namely, a number of cases recognize that a law providing law enforcement "unfettered discretion" to detain individuals violates the Fourth Amendment. Here, the regulations provide law enforcement this unfettered discretion, which in and of itself, makes them facially unconstitutional. These cases begin with the recognition that in *Terry v. Ohio*, the United States Supreme Court held that to "[justify] the particular intrusion [of stopping and searching

affects ... The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.'" *Casey*, 505 U.S. at 894.
[109] *Patel*, 135 S.Ct. at 2453.

someone on the street] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[110] Similarly, under Delaware law, a law enforcement officer may stop an individual if the officer has "reasonable ground to suspect" that the individual "is committing, has committed or is about to commit a crime, and may demand the person's name, [and] address..."[111] Germane to the challenged regulation, the Delaware Supreme Court has held that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops" and that "it is well established that an officer may ask a suspect to identity himself in the course of a *Terry* stop."[112]

Separate from lawful *Terry* stops are stops made to perform identification checks without reasonable cause. In *Delaware v. Prouse*, the United States Supreme Court held that stopping a car on a public highway to check his or her driver's license and vehicle registration without probable cause or reasonable articulable suspicion is unconstitutional.[113] A regulation giving blanket authority to a law enforcement officer in a State Park or Forest to demand identification based upon the unfettered discretion of a law enforcement officer is likewise unconstitutional.

Unlike the stops authorized by the regulations at issue, checkpoint stops are example of permissible administrative stops, provided they are conducted with procedures that eliminate unfettered law enforcement discretion. In this vein, Delaware courts have that sobriety checkpoints do not violate Fourth Amendment rights, provided they meet certain neutral administrative requirements, because they do not occur at the "unfettered discretion of the police

---

[110] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).
[111] 11 *Del. C.* § 1902(a).
[112] *Mills v. State of Delaware*, 900 A.2d 101, 2006 WL 1027202, at *2 (Del. Apr. 17, 2006) (TABLE).
[113] *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

33

officer in the field."[114] There is no such qualifying provision in the challenged regulations that would check law enforcement's unfettered discretion.[115] A law enforcement officer with complete discretion to conduct searches "impinges on … [the] rights to be free from unreasonable searches under the Fourth Amendment."[116]

As a final note, absence of these regulations does not mean that law enforcement personnel cannot enforce gun laws or gun related regulations in State Parks and Forests. Without the challenged regulations, law enforcement personnel will retain precisely the same authority to enforce both State gun laws and State Park and Forest regulations as they would anywhere else in the State. Namely, without the challenged regulations, upon reasonable articulable suspicion that a Park or Forest regulation or State statute had been violated, a *Terry*-stop level detention remains appropriate. Law enforcement would then be free to conduct an investigatory detention, and then a separate extended detention if so justified. Pursuant to these new regulations, however, law enforcement officers would have *carte blanche* authority to conduct background checks of all park visitors at will. It is in essence a "show me your papers" provision that facially does not pass State or Federal constitutional muster .

**The Agencies' regulations permitting DNREC and DDA to issue temporary concealed carry permits are preempted by 11 *Del. C.* § 1448.**

Plaintiffs also argue that the regulations enabling DNREC and DDA to recognize out-of-state concealed carry permits for visitors of State Parks and

---

[114] *State v. Cook*, 2013 WL 1092130, at *3 (Del. Super. Feb. 13, 2013).
[115] *C.f. Doe*, 88 A.3d at 668 (where the challenged WHA provision required "reasonable cause" that a gun law or policy was violated in order to justify an identification or permit check, although the policy was deemed overbroad and thus unconstitutional on other grounds).
[116] *State v. Faircloth*, 1995 WL 465323, at *7 (Del. Super. Jul. 6, 1995).

34

Forests are preempted by statute. The DNREC regulations outline this new authority granted to DNREC as follows:

> 21.1.4 Delaware residents holding an active current permit to carry a concealed deadly weapon may carry a firearm within areas administered by the Division, including designated areas, provided that the permit shall be produced upon request. *Residents of other states holding an equivalent permit or license to carry a concealed firearm may be permitted to carry a concealed firearm at the discretion of the Director.*[117]

Similarly, the DDA regulation seeks to grant the following authority to DDA:

> 8.8.3 Delaware residents holding an active current permit to carry a concealed deadly weapon may carry a firearm within areas administered by the Department, including designated areas, provided that the permit shall be produced upon request. *Residents of other states holding an equivalent permit or license to carry a concealed firearm may be permitted to carry a concealed firearm at the discretion of the Department.*[118]

Plaintiffs argue that these regulations are unlawful because they are preempted by statute. The Court agrees. Pursuant to 11 *Del. C.* §1441(k), the Attorney General has the sole authority to issue temporary concealed carry permits and must issue those permits pursuant to the standards outlined in that subsection. Furthermore, the State official given sole authority to determine which states receive reciprocity regarding concealed carry permits is also the Attorney General.[119] Thus, this limited field is at a minimum impliedly preempted by statute.

Furthermore, Section 1441(a) of Title 11 of the Delaware Code clarifies that licenses to carry concealed deadly weapons must be issued only upon certain conditions. Apart from these three-year licenses, the General Assembly granted

---

[117] 7 *Del. Admin. C.* 9201-21.1.4 (emphasis added).
[118] *See* 3 *Del. Admin. C.* 402-8.8.3 (emphasis added).
[119] 11 Del. C. § 1444(j).

the Attorney General the sole authority to issue temporary licenses for up to thirty days. It is important to observe that notwithstanding a DDA or DNREC issued temporary concealed carry permit, recipients of those permits would nevertheless remain subject to prosecution for carrying a concealed deadly weapon in a State Park or Forest. Under State law with the challenged regulations intact, the Agencies' decisions to grant applicants permits based on reciprocity could also easily conflict with the permits the Attorney General has already granted or refused to grant.[120] Although the Agencies intended for this part of the regulations to expand rights, regulations permitting them to recognize out-of-state permits in a manner inconsistent with the decisions of the Attorney General are unlawful. Thus, on state statutory law grounds, these portions of the regulations are preempted.

**"Day pass" regulations are not preempted by any State statute.**

Plaintiffs also challenge the legality of "day passes" that a new DNREC regulation authorizes. As opposed to the other regulations examined in this Opinion, there is no equivalent DDA regulation. These passes would apply to open carry rights in what are otherwise validly designated sensitive areas since DNREC seeks to ban only open carry in non-designated areas. The regulation that Plaintiffs challenge provides:

> 21.1.2 The Director may grant written approval on a daily basis for the possession of firearms within designated areas, upon written application showing good cause related to self-defense or the defense of family, and due regard for the safety of others within the designated areas.[121]

The Plaintiffs argue that these "day passes" are unlawful because the Attorney General was granted the exclusive power by the General Assembly to

---

[120] *See* 11 *Del. C.* § 1441(j) (setting forth the standards and proceedings to be employed by the Attorney General in making reciprocity decisions as to out-of-state concealed carry permits).
[121] 7 *Del. Admin. C.* 9201-21.1.2 (no corresponding regulation in 3 *Del. Admin. C.* 402-8.8).

issue temporary concealed carry licenses to non-residents pursuant to 11 *Del. C.* § 1441(k). However, this new regulation does not directly or impliedly conflict with the Attorney General's authority to issue and determine the reciprocity of concealed carry permits in Delaware or its authority to issue temporary concealed carry permits. Rather, this regulation gives the Director the discretion to permit open carry of firearms in areas that have been lawfully designated as sensitive areas. This regulation has not been preempted by statute and is therefore lawful.

### The unlawful portion of the regulations and the lawful portion of the regulations are severable.

Both parties have requested that the Court examine the regulations line by line. When a regulation faces a constitutional challenge, "a Court may preserve its valid portions if the offending language can lawfully be severed."[122] However, if the remaining provisions cannot be implemented without the unconstitutional or otherwise illegal provisions, the Court must invalidate the entire scheme.[123]

Here, with the agreement of the parties, and as independently determined by the Court, the unlawful regulations can be severed so that the remainder of the Agencies' regulations remain in effect. A number of the Agencies' regulations are valid and necessary for the orderly administration of Delaware's Parks and Forests. In this case, those that are not lawful can be effectively severed while leaving the bulk of the scheme intact. For clarity purposes, the Court has included as an Appendix to the Opinion, a redlined copy of the regulations delineating which regulations the Court declares to be unlawful and thus unenforceable.

### Conclusion

For the aforementioned reasons, the Court finds that the stricken portions of the regulations as shown in the Appendix attached to this Opinion are unlawful

---

[122] *Doe,* 88 A.3d at 669 (citing *Farmers for Fairness v. Kent County,* 940 A.2d 947, 962 (Del. Ch. 2008)).
[123] *Id.*

and unenforceable. All other regulations examined by the Court are Constitutional and are not preempted by Delaware statutes. Consequently, the parties' cross motions for summary judgment are **GRANTED** in part, and **DENIED** in part.

/s/ Jeffrey J Clark
Judge

**Challenged DNREC Regulations 7 *Del. Admin. C.* 9201-21.1**

21.1 It shall be unlawful to display, possess or discharge firearms of any description, air rifles, B.B. guns, sling shots, or archery equipment within designated areas administered by the Division, except with prior written approval of the Director, or as set forth below.

21.1.1 Designated areas shall include park offices, visitor centers, nature centers, bathhouses, restaurants and snack bars, stadiums and facilities while used for sporting events, concerts, and festivals, museums, zoos, stables, educational facilities, dormitories, playgrounds, camping areas, swimming pools, guarded beaches, and water parks, and shall be identified by appropriate signage.

21.1.2. The Director may grant written approval on a daily basis for the possession of firearms within designated areas, upon written application showing good cause related to self-defense or the defense of family, and due regard for the safety of others within the designated areas.

21.1.3 Active duty and qualified retired law enforcement officers may possess firearms within areas administered by the Division, including designated areas, provided that proper and current credentials shall be produced upon request.

21.1.4 Delaware residents holding an active current permit to carry a concealed deadly weapon may carry a firearm within areas administered

by the Division, including designated areas, provided that the permit shall be produced upon request. Residents of other states holding an equivalent permit or license to carry a concealed firearm may be permitted to carry a concealed firearm at the Discretion of the Director.

21.1.5 Firearms may be carried within areas administered by the Division, outside of designated areas, by any person not prohibited by 11 Del. C. §1448.

21.1.6 Law enforcement officers may limit the discharge of firearms and the use of other weapons within areas administered by the Division, in order to protect public safety and preserve the peace.

21.1.7 Any person possessing a firearm shall display identification upon request, sufficient to enable a law enforcement officer to undertake a background check.

**Challenged DDA Regulations 3 *Del. Admin. C.* 402-8.8**

8.8 Target shooting is prohibited. Firearms are allowed for legal hunting and are otherwise prohibited within designated safe areas on State Forest lands, except as set forth below.

8.8.1 Designated areas shall include State Forest Offices, education Centers, and lodges, and shall be identified by appropriate signage.

8.8.2 Active duty and qualified retired law enforcement officers may possess firearms within areas administered by the Department, including

40

designated areas, provided that proper and current credentials shall be produced upon request.

8.8.3. Delaware residents holding an active current permit to carry a concealed deadly weapon may carry a firearm within areas administered by the Department, including designated areas, provided that the permit shall be produced upon request. Residents of other states holding an equivalent permit or license to carry a concealed firearm may be permitted to carry a concealed firearm at the discretion of the Department.

8.8.4. Firearms may be carried within areas administered by the Department, outside of designated areas, by any person not prohibited by 11 Del. C. §1448.

8.8.5 Law enforcement officers may limit the discharge of firearms and the use of other weapons within areas administered by the Department, in order to protect public safety and preserve the peace.

8.8.6. Any person possessing a firearm shall display identification upon request, sufficient to enable a law enforcement officer to undertake a background check.