# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELAWARE CHARTER SCHOOLS NETWORK, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C.A. No. K22M-07-018 NEP |
| MARK A. HOLODICK, in his official as the Secretary of Education of the State of Delaware, | ) ) ) ) ) | |
| Defendant. | ) ) | |

Submitted: December 21, 2022
Decided: March 23, 2023

## MEMORANDUM OPINION AND ORDER

***Upon Cross-Motions for Judgment on the Pleadings***

*Plaintiffs' Motion for Judgment on the Pleadings*
**DENIED**

*Defendant's Cross-Motion for Judgment on the Pleadings*
**GRANTED**

James D. Taylor, Jr., Esquire (argued), William E. Manning, Esquire, Aubrey J. Morin, Esquire, and Juliana G. Clifton, Esquire, Saul Ewing Arnstein & Lehr, LLP, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Allison J. McCowan, Deputy Attorney General, Carla A.K. Jarosz, Deputy Attorney General, and Laura B. Makransky, Deputy Attorney General (argued), Department of Justice, Dover, Delaware, *Attorneys for Defendant*.

**Primos, J.**

## INTRODUCTION

Chapter 6 of Title 14 of the Delaware Code authorizes public school districts to levy a tuition tax, without an approving referendum, to pay "tuition" for students under limited circumstances. This case arises from a dispute between several Delaware charter schools and Delaware's Secretary of Education (hereinafter "the Secretary") over the scope of the charter schools' statutory right to be paid tuition from funds raised via that tuition tax (hereinafter "tuition tax funds" or "tuition tax dollars"). Section 509,[1] one of several provisions of Title 14 at the center of this disagreement, provides two mechanisms for charter schools to obtain funds from public school districts. The first is a "local cost per student" payment that charter schools receive annually on a per-pupil basis, the detailed formula for which is set out in Section 509(e). That formula excludes from the funds to which charter schools are entitled, *inter alia*, "local expenditures for tuition," which for purposes of this case means expenditures paid via tuition tax dollars. The second mechanism is found in Section 509(f), which provides in full that:

> For any student, who because of educational need requires services that are appropriately financed pursuant to the provisions of Chapter 6 of this title, either at the outset or subsequent to a decision to enroll in a charter school, the student's district of residence shall remain financially responsible for such student and the charter school shall receive from such district a payment determined in accordance with the provisions of Chapter 6 of this title.

At issue in this case is the correct interpretation of Section 509(f) and its interaction with certain provisions of Chapter 6.

Two specific provisions of Chapter 6, Sections 602 and 604, are essential to understanding this issue. First, Section 602 creates a mechanism for one school district to bill tuition charges to another when a student transfers to a school district

---

[1] This Opinion will frequently refer to provisions of Title 14 as "Section ___." For example, a reference to "Section 509" is the equivalent of writing out "14 *Del. C.* § 509."

outside of the student's district of residence. Of particular importance is Section 602(c), which provides that "[t]he bill for tuition charges shall be verified by the Secretary of Education within 20 days after receipt of such bill. No bill for tuition charges shall be paid until such time as it has been certified by the Secretary of Education as being true and correct." In other words, no tuition charges are paid until a bill is submitted to the Secretary of Education, and the Secretary verifies and certifies that bill. Second, Section 604, entitled "Special Programs," allows that same billing mechanism to be used to bill tuition charges for specific categories of students enrolled in certain programs, discussed in more detail below.

The plaintiffs in this action are the Delaware Charter Schools Network and affiliated charter schools (hereinafter "Plaintiffs"). They contend that Section 509(f) entitles charter schools to submit bills for tuition charges (pursuant to Sections 602 and 604) in order to obtain reimbursement for various services that they provide to their students. Moreover, they believe that the school districts are levying tuition taxes to fund similar services for their own students. The pleadings, however, do not identify with any specificity the services that Plaintiffs seek to fund through these bills, nor do they specify how the traditional school districts currently use tuition tax dollars (except to say that those uses have expanded over time).

Before this Court are cross-motions for judgment on the pleadings in an action for declaratory judgment and mandamus relief. In deciding these motions, the Court is called upon to construe multiple interrelated provisions of Title 14 with very limited information about the practical effect of such a ruling. Accordingly, the Court will proceed with caution in addressing interpretive questions that are not strictly necessary to decide whether Plaintiffs are entitled to the specific forms of relief requested. For the reasons that follow, Plaintiffs' motion for judgment on the pleadings is **DENIED**, the defendant's cross-motion for judgment on the pleadings is **GRANTED**, and the action is **DISMISSED WITHOUT PREJUDICE**.

3

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In November of 2021, several charter schools submitted bills to the Secretary,[3] seeking reimbursement for their expenditures on "specialized services and programs" (referred to by Plaintiffs as "Special Services").[4] The Supplemental Complaint contains two illustrative examples. First, the Newark Charter School submitted "a detailed and valid bill . . . covering 74 complex and intensive students and seeking approximately $1,600,000 in reimbursement . . ."[5] Odyssey, another charter school, submitted "an equally detailed and valid bill, covering 67 complex and intensive students and seeking approximately $350,000 in reimbursement . . ."[6] Taken together, the bills submitted by the plaintiff charter schools in November 2021 (hereinafter the "2021 tuition tax bills") sought over four million dollars in reimbursement from Delaware's traditional public school districts.[7] The charter schools received no response from Secretary Bunting or her successor, Secretary Holodick (hereinafter "Defendant").[8]

On July 25, 2022, Plaintiffs filed a complaint seeking a declaratory judgment and a writ of mandamus to compel Defendant to "verify" and "certify" the bills pursuant to Section 602.[9] Defendant filed an answer on September 15, 2022, generally admitting Plaintiffs' factual allegations but denying, without explanation, Plaintiffs' interpretation of the statutes at issue.[10] On November 8, 2022, Plaintiffs

---

[2] The facts herein are as alleged in Plaintiffs' Supplemental Complaint unless otherwise indicated.
[3] Suppl. Compl. for Decl. and Writ of Mandamus (D.I. 24) [hereinafter "Suppl. Compl."] ¶¶ 9 and 36. At the time, this was Secretary Susan Bunting, who is not a party to this action. *Id.* ¶ 24.
[4] *Id.* ¶ 4.
[5] *Id.* ¶ 37.
[6] *Id.* ¶ 38.
[7] *Id.* ¶ 36.
[8] *Id.* ¶ 41.
[9] Compl. for Decl. and Writ of Mandamus (D.I. 1).
[10] Def. Mark A. Holodick's Answer to Pls.' Compl. (D.I. 10) [hereinafter "Answer"]. For example, "[a]ll statements in paragraph 7 are legal conclusions to which no response is required and reference to statutes [sic]; those statutes speak for themselves." *Id.* ¶ 7.

filed a motion for judgment on the pleadings pursuant to Superior Court Civil Rule 12(c), arguing that, in light of Defendant's answer, there were no disputes of material fact and that the matter posed only a question of statutory interpretation.[11] On November 22, 2022, Defendant filed a cross-motion for judgment on the pleadings and opposition to Plaintiffs' motion.[12] In that submission, Defendant argued that since the object of the suit was to compel action by the Secretary, the remedy (if any) "lies in an action for mandamus, not declaratory judgment."[13] However, he further argued that the discretion inherent in the Secretary's review of the bills placed the request "beyond the scope of mandamus."[14] Plaintiffs filed their reply and opposition on November 30, 2022,[15] and Defendant filed a reply on December 7, 2022.[16]

While briefing on the cross-motions was ongoing, Plaintiffs, along with several other charter schools, submitted another round of bills on November 15, 2022 (hereinafter the "2022 tuition tax bills").[17] This time, the charter schools received an email response stating that Defendant's "position on [the] ineligibility of charter schools to submit tuition bills remains unchanged."[18] Upon the parties' stipulation and agreement, the Court allowed Plaintiffs to file a supplemental

---

[11] Pls.' Mot. for J. on the Pleadings (D.I. 15) [hereinafter "Pls.' Mot."].

[12] Def.'s Cross-Mot. for J. on the Pleadings and Resp. in Opp'n to Pls.' Mot. for J. on the Pleadings (D.I. 17) [hereinafter "Def.'s Cross-Mot. and Opp'n"].

[13] *Id.* at 6.

[14] *Id.* at 10.

[15] Pls.' Reply in Support of their Mot. for J. on the Pleadings and Opp'n to Def.'s Mot. for J. on the Pleadings (D.I. 19) [hereinafter "Pls.' Reply and Opp'n"].

[16] Def.'s Reply in Further Support of his Cross-Mot. for J. on the Pleadings (D.I. 23) [hereinafter "Def.'s Reply"].

[17] Suppl. Compl. ¶¶ 10 and 42.

[18] *Id.* ¶ 42 (alteration in original). The Supplemental Complaint is quoting an exhibit that does not appear to be attached, but this is of no consequence because the Court accepts the well-pleaded allegation regarding the content of the email as true.

5

complaint addressing the 2022 tuition tax bills, which was filed on December 8, 2022.[19]

The Court heard oral argument on the cross-motions for judgment on the pleadings on December 21, 2022.[20]

## RELIEF REQUESTED

Plaintiffs' Supplemental Complaint asks for a declaration that the "bills for tuition charges are deemed verified and certified," or, in the alternative, a writ of mandamus "ordering the Secretary to verify and certify the Petitioners' bills for tuition charges . . . within 20 days of the issuance of the Writ."[21]  In their motion for judgment on the pleadings, however, Plaintiffs broke down the requested relief into three parts: 1) a "declaration that Section 602(c) requires that the Secretary act upon all tuition tax bills submitted within 20 days of their receipt"; 2) a declaration that the 2021 tuition tax bills be deemed "verified" and "certified" and thus presented to the school districts for payment; and 3) a writ of mandamus compelling the Secretary "to act upon" the 2022 tuition tax bills.[22]

At oral argument, Plaintiffs changed their principal relief request once again, asking the Court for a declaration construing Section 509(f).  Specifically, they requested the following construction of 509(f)—that if a charter school student is receiving services at the charter school, and those same services are funded through tuition tax funds in that student's school district of residence, then the charter school is entitled to submit a bill for tuition charges to receive reimbursement for providing

---

[19] Suppl. Compl. (D.I. 24).
[20] *See* Tr. of Oral Arg. on Cross-Mots. for J. on the Pleadings (D.I. 26) [hereinafter "Tr. of Oral Arg."].
[21] Suppl. Compl. Prayer for Relief ¶¶ 1–2.
[22] Pls.' Mot. at 8–9.

those services.[23]   In the interests of fairness, the Court will consider each relief request in its discussion.

## STANDARD OF REVIEW

"The standard for a motion for judgment on the pleadings is almost identical to the standard for a motion to dismiss."[24]  All well-pleaded allegations are accepted as true, and the Court will grant the motion only when, "after drawing all reasonable inferences in favor of the non-moving party, no material factual dispute exists and the movant is entitled to judgment as a matter of law."[25]  It is "analytically similar" to a motion for summary judgment, except that the Court's review is limited to the facts contained in the pleadings.[26]  The "mere presence of cross-dispositive motions 'does not act *per se* as a concession that there is an absence of factual issues'" and the Court will thus "deny a cross Rule 12(c) motion if the cross-movant fails to show no material factual issue exists."[27]

---

[23] *See* Tr. of Oral Arg. at 21:5–11 ("What we hope to achieve through this lawsuit is a declaration saying that these dollars follow the student.  And that if Johnny is receiving services in a Charter School, that those very same services are being covered by tuition tax payments in the district, then 509(f) says those dollars follow."); *id.* at 40:18–23 ("[W]hat I think the case has distilled down to is a declaration that the statute means that if the services are being paid for at a district out of tuition tax dollars, then when Johnny leaves the district or Johnny enrolls in the Charter School, those dollars follow Johnny."); *id.* at 48:8–14 ("[T]he relief has really turned to a declaration" that "if a district is financing these services out of Chapter 6 with tuition tax dollars, then these dollars follow the student.").

[24] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *8 (Del. Super. Aug. 16, 2021) (quoting *Silver Lake Office Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, at *6 (Del. Super. Jan. 17, 2014)).

[25] *Id.*

[26] *Id.*  Superior Court Civil Rule 7(a) defines pleadings to include, as relevant here, a "complaint and an answer."  Representations of fact in the motions or at oral argument are not part of the Court's analysis.

[27] *Intermec*, 2021 WL 3620435, at *8 (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)).

7

## DISCUSSION

## I. Statutory Framework

This case involves intersecting provisions of Title 14 of the Delaware Code, a selective overview of which is necessary to understand the issues before the Court. Insofar as the Court must interpret disputed statutory provisions, it follows Delaware's well-settled principles of statutory construction. First, the Court will apply the plain meaning of an unambiguous statute.[28] If, however, statutory language is "reasonably susceptible to different conclusions or interpretations," it is ambiguous,[29] and the Court may consider canons of statutory construction and legislative history.[30] Where, as here, the Court must construe multiple provisions in tandem, "[e]ach part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole."[31]

### a. Chapter 5

Chapter 5 of Title 14 (entitled "Charter Schools")[32] establishes and regulates Delaware's charter school system. The chapter's stated purpose is "to create an alternative to traditional public schools operated by school districts and improve public education overall by establishing a system of independent charter schools throughout the State."[33] Section 503, as indicated by its title, describes the "legal status" of charter schools. First, it establishes that charter schools are public schools, but that they operate "independently of any school board" under a renewable charter. Second, and most relevant here, it provides that "[f]or purposes of this chapter as it

---

[28] *See Noranda Aluminum Holding Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 977–78 (Del. 2021) ("If the plain statutory text admits only one reading, we apply it.").

[29] *Judicial Watch, Inc. v. Univ. of Delaware*, 267 A.3d 996, 1004 (Del. 2021).

[30] *Noranda*, 269 A.3d at 978 ("If there is a legitimate ambiguity, we consult the canons of statutory construction and may consider legislative history.").

[31] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 117 (Del. 2020).

[32] 14 *Del. C.* §§ 501–518.

[33] *Id.* § 501 (internal quotation marks omitted).

8

relates to the management of a charter school, the board of directors of a charter school . . . shall have the same standing and authority as a Reorganized School District Board of Education, except the power to tax."[34]

As noted above, charter schools receive public funds pursuant to Section 509.[35] Specifically, charter schools receive funds from their students' districts of residence in two ways. First, they receive annually the "local cost per student" as calculated by the formula set forth in subsection 509(e), which excludes local expenditures for tuition (i.e., expenditures on anything funded by tuition tax dollars).[36] Second, subsection 509(f) (quoted in full in the Introduction to this Opinion) provides that charter schools shall receive payments "[f]or any student, who because of educational need requires services that are appropriately financed pursuant to the provisions of Chapter 6 of this title . . . ."

### b. Chapter 6

Chapter 6 (entitled "Tuition Charges")[37] establishes the procedures by which one school district (the "receiving district") may bill another school district (the "sending district") for tuition charges when a student who resides in the sending district transfers to the receiving district.[38] As explained above, it authorizes school districts to collect a tuition tax to pay these tuition bills, bypassing the typical referendum requirement for educational taxes.[39]

---

[34] *Id.* § 503.

[35] *See id.* § 509(a) ("Charter schools shall be eligible for public funds under procedures established by this section.").

[36] *See id.* § 509(b)(2), (d), and (e).

[37] 14 *Del. C.* §§ 601–608.

[38] *Id.* §§ 601 and 602.

[39] *Id.* § 602(e) ("Any reorganized school district sending pupils to the schools of another district shall levy and collect a tax to pay any tuition charges to the receiving district, and such tuition shall be collected by local taxation within the sending district according to the provisions of taxation as set forth in Chapter 19 of this title, except that no referendum shall be required.").

Section 604, entitled "Special Programs," further provides that the receiving district may collect a tuition charge for "any pupil [who] is counted in the preschool, intensive or complex unit and attends school in a program operated by a district other than that in which the pupil resides."[40] A school district "shall be both the sending and receiving district" when that district is "assigned by the Department with the

---

[40] 14 *Del. C.* § 604 provides in full as follows (with emphasis supplied):

(a) **If any pupil is counted in the preschool, intensive or complex unit and attends school in a program operated by a district other than that in which the pupil resides**, by an agency of the Department of Education or is in an approved private placement pursuant to § 3124 of this title, **the receiving district or the Department of Education shall collect a tuition charge for the nonresident pupil**, provided approval for attendance has been granted by the sending district. Such tuition charge shall be paid by the school board of the reorganized school district in which the pupil is a resident from the proceeds of a local tax levied for this specific purpose, except that **in the case of a district assigned by the Department with the approval of the State Board of Education to administer a school or program for children with disabilities, or special programs approved by the Department of Education for persons without disabilities such as programs for bilingual students or programs for pregnant students, the district so assigned shall be both the sending and receiving district in regard to that school or program** and is authorized to collect tuition charges accordingly.

(b) **In determining the tuition to be charged for a pupil counted in the preschool, intensive or complex units or for a person without disabilities attending approved special programs, such as bilingual programs or programs for pregnant students operated by a district other than that in which the student resides or by an agency of the State Department of Education, the receiving district or the State Department of Education shall compute the tuition by adding such receiving district's share of educational related expenses as allowed by the Department of Education regulations.** The sum so obtained shall be divided by the total number of pupils in the special program as of September 30 of the current school year. The resulting figure shall represent the amount of the "tuition charge" per pupil.

(c) In determining the tuition charged to the sending district in the case of private placement for children with disabilities, tuition will be defined as in § 3124 of this title and the sending district will be charged 30 percent of the total tuition cost. The remaining 70 percent will be covered through funding provided by the State Department of Education from the annual appropriation for this purpose.

(d) **Section 602(c)-(e) of this title shall apply to this section**.

10

approval of the State Board of Education to administer a school or program for children with disabilities, or special programs approved by the Department of Education for persons without disabilities such as programs for bilingual students or programs for pregnant students."[41]  Finally, for the mechanics of collecting tuition charges, Section 604 refers to the provisions in Section 602(c)–(e).[42]  As relevant here, Section 602(c) provides that "[t]he bill for tuition charges shall be verified by the Secretary of Education within 20 days after receipt of such bill" and that "[n]o bill for tuition charges shall be paid until such time as it has been certified by the Secretary of Education as being true and correct."

The nature of the programs that may be funded pursuant to Section 604 is disputed by the parties.  Plaintiffs argue that there is a distinction between "program" and "special program" as used in subsection (a) and subsection (b), respectively, of Section 604, and that tuition taxes may be used to fund both programs and special programs.[43]  Defendant, on the other hand, argues that the entire section refers exclusively to "special programs."  This distinction is important because "special program" has a particular meaning in the context of Title 14.  Specifically, Section 203 (also entitled "Special Programs")[44] provides as follows:

> The Department with the approval of the State Board of Education and the school board of any local reorganized school district, either separately or jointly, may establish special programs for children who are in need of education not provided for in regular classes or schools. Such special programs may include, but are not limited to, bilingual

---

[41] *Id.* § 604(a).

[42] *Id.* § 604(d).

[43] Tr. of Oral Arg at 27:1–28:7.

[44] Both Section 203 and Section 604 were amended in 2011 to be titled "Special Programs."  *See* 78 Del. Laws, ch. 5 §§ 1 and 6 (2011).

11

programs, programs for persons who are truant or insubordinate or programs for pregnant students.[45]

Thus, if Section 604 is limited to special programs as defined in Section 203, bills for tuition charges may only be submitted pursuant to Sections 602(c) and 604 in order to fund formally approved special programs, rather than any program offered for students in the preschool, intensive, or complex units.

### c. Interaction Between Chapter 5 and Chapter 6

Section 509(f) invokes "the provisions of Chapter 6" but does not specify to which provisions or subsections of Chapter 6 it is referring. However, several features of Title 14 provide essential context. First, charter schools, unlike school districts, are expressly denied "the power to tax."[46] Second, Chapter 6 authorizes school districts to levy a tax, without a referendum, for the limited purpose of paying tuition charges.[47] Third, charter schools do not receive a share of "local expenditures for tuition" pursuant to the funding formula for local cost per student.[48] Thus, when school districts fund services through tuition tax funds, charter schools do not receive any of those funds in the local cost per student payment, and the only way to obtain funding for similar services is to seek reimbursement via Section 509(f).

Defendant's argument for why charter schools are nevertheless ineligible to submit bills for tuition charges has evolved over the course of briefing and oral argument. In his cross-motion and opposition, Defendant appeared to argue that none of the provisions of Chapter 6 are applicable to charter schools, and specifically, that Section 604 is inapplicable because charter schools are not eligible to establish special programs pursuant to Section 203, i.e., because Section 203

---

[45] 14 *Del. C.* § 203; *see also* 14 Del. Admin. C. § 737-2.0 ("'Special Program' means a program established pursuant to 14 Del.C. § 203 or that has been approved as a Special Program by the Department of Education with the consent of the State Board of Education.").

[46] 14 *Del. C.* § 503.

[47] *Id.* § 602(e).

[48] *Id.* § 509(e).

12

refers directly to "the Department and reorganized school districts—not Charter Schools."[49] In response, Plaintiffs argued in their reply and opposition that Section 503 means that "charter schools are to be treated as if they were regular districts in precisely the circumstances present here."[50] In his reply, Defendant did not expressly dispute this reading of Section 503, and argued instead that since "[n]o Charter schools run an approved special program" in practice, "the invoices submitted to Sec[retary] Holodick for verification do not qualify as bills for tuition charges requiring verification."[51] Finally, at oral argument, Defendant's counsel fully renounced the position stated in Defendant's cross-motion and opposition, and conceded that Sections 203, 503, 509(f), and 604, when read together, do in fact establish that a charter school could apply for and run an approved "special program" and that it would be eligible to submit bills for tuition charges to fund that special program.[52]

---

[49] Def.'s Cross-Mot. and Opp'n at 7–8.
[50] Pls.' Reply and Opp'n at 5.
[51] Def.'s Reply at 4.
[52] *See* Tr. of Oral Arg. at 61:10–62:22.

> **[The Court:]** What was Section 509(f) meant to accomplish then? What would be the circumstances where it would come into play where—in other words, what would be the circumstances where a Charter School would be reimbursed for a student?
>
> **Ms. Makransky:** I think if you had a Charter School that sought approval of a special program, that offered a special program—Charter Schools are not precluded from doing so. They just haven't. . . . So with that in mind, the Charter School could apply to offer a special program just as a traditional public school would.
>
> …
>
> **The Court:** So the Secretary's argument is that where it says, for example, in 14 Del. Code Section 203: ["]The department, with the approval of the State Board of Education and the school board of any local reorganized school district, may establish special programs for children who are in need of education not provided for in regular classes or schools.["]
>
> So that pursuant to Section 503, which really equates Charter Schools, from a legal standpoint, with school districts, you would just substitute—instead of school board

Reading these statutory provisions together, the Court agrees that Section 509(f) unambiguously entitles charter schools to submit bills for tuition charges in order to fund any services that are "appropriately financed" pursuant to Chapter 6, and specifically, Section 604. Any reading of Chapter 6 that precluded charter schools from submitting bills for tuition charges altogether would render Section 509(f) a nullity, an untenable position as a matter of statutory interpretation. Insofar as there is any ambiguity, construing Section 509(f)'s reference to Chapter 6 as an empty cross-reference would be antithetical to the canon of statutory construction that statutory schemes are to be construed as a "harmonious whole."[53] Moreover, no other section of Chapter 6 clearly relates to students who require services "because of educational need."[54]

The Court will not, however, opine on what kinds of services are appropriately financed pursuant to Section 604 (and specifically, whether it is limited in scope to authorizing tuition tax funds to fund approved special programs), for reasons explained more fully below. For purposes of clarity, it bears emphasizing that the Court *is not* holding that tuition tax funds may be used to fund programs that are not special programs, but it also is not ruling out the possibility of a broader reading of Section 604 for the purposes of its analysis. Rather, the following discussion will focus specifically on the various requests for relief that have been suggested over the course of this litigation.

---

of any local reorganized school district, you would just substitute board of directors of a Charter School.

**Ms. Makransky:** Correct.

[53] *Salzberg*, 227 A.3d at 117.

[54] 14 *Del. C.* § 509(f). Defendant's counsel suggested for the first time at oral argument that the "services" referenced in Section 509(f) might also refer to 14 *Del. C.* § 607, a provision regarding tuition for children of district employees who reside out-of-state, and which she agrees has no practical application to this case. *See* Tr. of Oral Arg. at 54:7–12.

14

## II. Count I: Declaratory Judgment

Plaintiffs ask this Court to issue several different declarations pursuant to its authority under the Declaratory Judgment Act.[55] A Delaware trial court may entertain a declaratory judgment action only if an "actual controversy" exists.[56] An "actual controversy" has four criteria:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[57]

Defendant has not argued that any of those conditions are absent in this case, and the Court will assume *arguendo* that an actual controversy exists. Even so, a trial court "has discretion in determining whether to entertain a declaratory judgment action."[58] For example, the Court might "refuse to enter a declaratory judgment when granting such a judgment 'will not terminate the uncertainty or controversy giving rise to the proceeding.'"[59]

As to the original declaration requested in the Supplemental Complaint, the Court cannot, as a matter of law or fact, declare the 2021 tuition tax bills "verified" and "certified" for the simple reason that the content of the bills is not in the record of this case. Even assuming *arguendo* that the submitted bills are "bills for tuition

---

[55] 10 *Del. C.* §§ 6501–6513.

[56] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014) (quoting *Gannett Co., Inc. v. Bd. of Managers of the Delaware Criminal Justice Info. Sys.,* 840 A.2d 1232, 1237 (Del. 2003)).

[57] *Id.* at 1217.

[58] *Id.* at 1216.

[59] *Delaware State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1260 (Del. Super. 2018) (quoting 10 *Del. C.* § 6506)).

charges" within the meaning of the applicable statutes, the Court cannot at this stage certify them as "true and correct" because there is nothing for the Court to review.

In the motion for judgment on the pleadings, Plaintiffs also requested a declaration "that Section 602(c) requires that the Secretary act upon all tuition tax bills submitted within 20 days of their receipt."[60] The Court will not, however, issue a declaration that would not resolve the dispute between the parties, which this declaration would fail to do for two reasons. First, a declaration requiring Defendant "to act" would be too vague to put him on adequate notice as to what, exactly, he is required to do. Second, since the underlying dispute between the parties turns on the interaction of Section 602(c) with several other provisions, namely, Sections 509(f) and 604, a declaration construing Section 602 in isolation would be of little use.

That leaves the declaration requested by Plaintiffs at oral argument—i.e., that if a charter school student is receiving services at the charter school, and those same services are funded through tuition tax funds in that student's school district of residence, then the charter school is entitled to submit a bill for tuition charges to receive reimbursement for those services.[61] In other words, whatever services traditional school districts use tuition tax funds for, charter schools are entitled to reimbursement for providing those same services. In effect, without knowing how the school districts are using tuition tax funds, the Court would simply declare that charter schools are entitled to do the same and receive reimbursement. However, in order for a charter school to be entitled to reimbursement, Section 509(f) requires that the charter school offer services that are "appropriately financed pursuant to the provisions of Chapter 6." The requested declaration would alter the meaning of Section 509(f), transforming it from a legal inquiry into whether the charter school

---

[60] Pls.' Mot. at 8.
[61] *See supra* note 23 and accompanying text.

16

is offering a service "appropriately financed" by Chapter 6 into a factual inquiry as to whether a particular service is in practice financed with tuition tax dollars by public school districts. This would effectively read the word "appropriately" out of the statute, if, for example, school districts were using tuition tax funds inappropriately.

Plaintiffs attempted to resolve this issue by asserting at oral argument that no one is "submitting . . . that districts are violating Chapter 6."[62] While this is true, the record is equally devoid of any representations to support the conclusion that school districts are staying within the confines of Section 604 when exercising their tuition tax power. Defendant has consistently maintained that how the school districts are using tuition tax dollars is irrelevant to this case.[63] Plaintiffs, meanwhile, assert that "[o]ver time, . . . the traditional [school] districts have funded more and more services with Tuition Tax revenues."[64] It is not readily apparent how they could have done so given that Section 604 has remained largely the same since at least 2011.[65] This is not to say that the school districts are necessarily disregarding the limits of Chapter 6—rather, the Court has no information in the pleadings as to how school districts are using their tuition tax funds, other than the broad assertion above

---

[62] Tr. of Oral Arg. at 82:1–2.

[63] *See* Def.'s Reply at 4 ("Plaintiffs sidestep the fact that no charter schools run an approved special program, as required by Sec[tion] 604(a), to argue apparently in the alternative that districts are not staying within the confines of Sec[tion] 604(a) so why should charter schools?"); Tr. of Oral Arg. at 57:8–9 ("[W]hat the districts do is not an issue that is before the Court."); *see also id.* at 62:23–63:3 ("**The Court:** And you just don't know whether school districts are currently using tuition tax funds to pay for services or programs other than special programs? You just are not aware of that? **Ms. Makransky:** I do not, Your Honor.").

[64] Suppl. Compl. ¶ 30; Tr. of Oral Arg. at 13:21–14:1 ("There's no dispute that permitted uses of tuition tax revenues have been greatly expanded by the districts themselves."); *see also* Pls.' Reply and Opp'n at 6–7 ("There will be no dispute that the uses to which tuition tax revenues may be applied has expanded and districts are servicing more of their own students with that source of revenue (which, unlike the tax that funds more ordinary operations, requires no approving referendum).").

[65] 78 Del. Laws, ch. 5, §§ 6-10 (2011).

that they "have funded more and more" services with them.[66] Defendant appears to deny this allegation.[67] Either way, the Court has no basis to conclude that those uses are for services "appropriately financed" within the meaning of Section 509(f), the only section under which charter schools are entitled to obtain reimbursement.[68]

Defendant urges the Court to go one step further and construe Section 604 to mean that a charter school is only eligible to submit bills for tuition charges if it runs an approved special program. Under Plaintiffs' reading, by contrast, charter schools would be eligible to submit bills both for approved "special programs" and for "programs."[69] Plaintiffs do not, however, elaborate on what the latter means in practice, i.e., they do not specify when a service for a student designated complex or

---

[66] Suppl. Compl. ¶ 30. At oral argument, the description was slightly more specific:

> [The tuition tax is] no longer just a device to pay for private placements. And it covers now, by districts subject to invoices that have been submitted by the plaintiff Charter Schools here, what are known as classified as [sic] . . . complex and intensive students. We don't have to get into the weed[s] about what causes that classification to be made, but there's no dispute between the parties that there is that classification and that districts are using tuition tax dollars to serve students with those classifications.

Tr. of Oral Arg. at 14:10–20. This representation is outside of the pleadings and would not resolve the deficiency in any event, as it focuses only on the classification of the students and not the services offered.

[67] See Answer ¶ 28 ("To the extent a response is deemed necessary, the allegations are denied."). The paragraph numbers in the Answer correspond to the original Complaint rather than the Supplemental Complaint; Defendant has not filed an answer to the Supplemental Complaint.

[68] If traditional school districts are exceeding the confines of Section 604 and thus cutting charter schools out of revenue to which they are entitled, Plaintiffs might be able to obtain some form of equitable relief from the Court of Chancery, or, as Defendant suggests, a legislative solution to alleviate the funding challenges faced by both school districts and charter schools. See Def.'s Reply at 4 ("Plaintiffs' request for a mandamus or declarative judgement should be denied and instead recommended to the General Assembly for review of whether a statutory process that has not been updated since 1995 is still meeting the needs of Delaware's students."); Tr. of Oral Arg at 63:15–18 ("[**Ms. Makransky:**] [T]o the extent that this is really about making sure that there's additional funding to help serve these populations, our position is the remedy lies with the legislature.").

[69] Plaintiffs actually suggest that "services" as used in Section 509(f) could mean something even broader than "program" or "special program" as used in Section 604. See Tr. of Oral Arg. at 25:7–19. They do not, however, point to anything in Section 604 or Chapter 6 that authorizes tuition tax funding for a broad category of unenumerated services.

18

intensive qualifies as a "program" within the meaning of Section 604. The Court declines to rule on this question of statutory construction because, on the record before it, such a ruling would be dicta. Even if the Court were to hold that Section 604 may appropriately be used to fund programs for students in the intensive or complex units that are not approved special programs, this would not automatically entitle Plaintiffs to relief—the appropriate question would then be whether the "Special Services" for which Plaintiffs seek reimbursement are "programs" within the meaning of the statute. The Supplemental Complaint identifies only the classifications of the students enrolled in the charter schools and is otherwise sparse in detail about the actual services provided to those students. The Court declines to issue an advisory opinion on the contours of Section 604 in the form of a declaratory judgment.[70] For the reasons above, Plaintiffs' motion for judgment on the pleadings with respect to Count I, the declaratory judgment count, is **DENIED**.[71]

The disposition of Defendant's cross-motion with respect to the declaratory judgment count, however, presents a slightly more difficult question. As explained *supra*, the Court will not grant a motion for judgment on the pleadings if there is a dispute of material fact in the pleadings. Thus, the Court must determine whether the factual gaps previously identified—(1) how the school districts use tuition tax

---

[70] *See Ackerman v. Stemerman*, 201 A.2d 173, 175 (Del. 1964) ("[T]he Declaratory Judgment Act is not to be used as a means of eliciting advisory opinions from the courts.").

[71] At the end of oral argument, Plaintiffs' counsel offered to limit the requested declaration to cover services provided by the school districts only if those services are appropriately financed pursuant to Chapter 6. *See* Tr. of Oral Arg. at 83:13–18 ("I would be perfectly content with a declaration . . . that said if the services are appropriately financed under Chapter 6 by the district, and those same services are being delivered in the Charter School, then Charter Schools are eligible."). However, in light of both Defendant's concession that a charter school could submit bills for tuition charges if it ran an approved special program, *see supra* note 52, and the continued dispute between the parties about the meaning of Section 604, such a declaration would do little to resolve the underlying controversy between the parties.

funds and (2) the kinds of services for which the plaintiff charter schools seek reimbursement—are questions of material fact.

First, the Court agrees with Defendant that how the school districts use tuition tax funds is not material to this case. The eligibility of charter schools for reimbursement via tuition charges ultimately turns on the terms of Chapter 6, not the school districts' interpretation of it.

Second, the Court has indicated that it lacks sufficient information about Plaintiffs' bills for "Special Services" and what exactly they entail to hold that Plaintiffs are entitled to have the bills deemed verified and certified and presented to the school districts for payment. At first blush, this unknown factor looks more like a material fact than the first. However, since a material fact is one that could "favor the nonmoving party in a determinative way,"[72] a fact's materiality necessarily depends on the relief requested by the parties. Plaintiffs have never asked this Court to opine on the content of the bills, which is presumably why they are not pleaded with greater specificity. Rather, their requested declarations presuppose that the bills are valid bills for tuition charges, so long as school districts are using tuition tax funds in the same manner.[73] That is a disputed proposition of law (with which the Court disagrees), not one of fact. Moreover, Plaintiffs have expressly taken the position that the Court need not "go any deeper than" construing

---

[72] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[73] The declaration requesting that the Court deem the bills "verified" and "certified" was not premised on a request that the Court conduct any review or factfinding on the substance of the bills, but rather was framed as a remedy for the Secretary's failure to act on them. *See* Suppl. Compl. ¶ 52 ("Inasmuch as the Secretary failed to act consistent with Section 602(c), and inasmuch as this non-discretionary act is a condition precedent to the presentment of the invoices to the District of Residence, the Court should declare that the requirement of Section 602(c) has been satisfied and the Petitioners' invoices are deemed verified and certified.").

20

Section 509(f) to entitle charter schools to reimbursement from tuition tax dollars for the same purposes for which school districts use those funds.[74] At no point have the parties disputed the content of the bills—rather, both have argued that they do not matter, albeit for different reasons.[75]

In declining to hold that Section 604 is *necessarily* limited to funding approved special programs, the Court leaves open *the possibility* that the specific content of the bills is ultimately relevant to whether they are appropriately funded with tuition tax dollars. However, Plaintiffs bear the burden of establishing that they are entitled to the declaratory relief requested.[76] As noted *supra*, Plaintiffs have expressly disclaimed requesting any relief that puts this Court "in the position of judging which services are and are not covered by tuition tax."[77] So long as there is a possibility that the services for which Plaintiffs seek reimbursement are not appropriately funded by tuition tax dollars, there will remain some uncertainty over whether Defendant should certify the bills that have been submitted. The Court, using the discretion conferred on it pursuant to 10 *Del. C.* § 6506, declines to enter a declaratory judgment that "will not terminate the uncertainty or controversy giving rise to the proceeding." Because, as explained *supra*, Plaintiffs' proposed declarations either fail as a matter of law (regardless of whether Section 604 encompasses "programs" or just "special programs") or would not terminate the

---

[74] Tr. of Oral Arg. at 21:7–12; *see also id.* at 83:19–23 ("I'm not in any way, shape or form suggesting that Your Honor should issue an order of declaration of any sort that has Your Honor in the position of judging which services are and are not covered by tuition tax.").

[75] To review, Plaintiffs have argued that whether the bills should be verified and certified depends only on whether school districts are using tuition tax funds for the same purposes for which charter schools seek reimbursement. Defendant, however, has argued that the content of the bills is immaterial because no charter school runs an approved special program, and therefore the bills cannot possibly be valid bills for tuition charges.

[76] *See State Farm Mut. Auto. Ins. Co. v. Spine Care Delaware, LLC*, 238 A.3d 850, 860 n.55 (Del. 2020) (explaining that the plaintiff in a declaratory judgment action bears the burden of proof and, in most cases, the burden of persuasion).

[77] Tr. of Oral Arg. at 83:19–23.

21

uncertainty regarding the tuition tax bills, there is no dispute of material fact in this case. Accordingly, Defendant's cross-motion for judgment on the pleadings, with respect to Plaintiffs' declaratory judgment claim, is **GRANTED**.

## III. Count II: Petition for Mandamus

Finally, Plaintiffs seek a writ of mandamus compelling Defendant to act on his power to "verify" and "certify" bills for tuition charges. While this Court has the power to issue a writ of mandamus pursuant to 10 *Del. C.* § 564, it may only do so "when a plaintiff is able to establish a clear legal right to the performance of a non-discretionary duty."[78] "[W]hen directed to an administrative agency or public official, mandamus will issue only to require performance of a clear legal or ministerial duty" and that "duty *must* be prescribed with such precision and certainty that nothing is left to discretion or judgment."[79] Moreover, "[m]andamus is issuable not as a matter of right, but only in the exercise of sound judicial discretion."[80] This "broad discretion" allows the Superior Court to deny a petition where the petitioner has another remedy available, granting the writ would be inequitable, events after filing render it moot, or granting the writ would be useless.[81]

Plaintiffs appear to concede that the Court cannot issue a writ of mandamus ordering the Secretary literally to "verify" and "certify" the bills they submitted, since the statute presupposes substantive review to ensure that the bills are "true and correct."[82] Rather, they argue that the statute imposes an unambiguous duty "to act" upon the submitted bills within 20 days.[83] This concession is ultimately fatal to Plaintiffs' request for mandamus relief, because a duty to "act on" the bills is not

---

[78] *Darby v. New Castle Gunning Bedford Ed. Ass'n*, 336 A.2d 209, 210 (Del. 1975).
[79] *Guy v. Greenhouse*, 637 A.2d 827, 1993 WL 557938, at *1 (Del. 1993) (TABLE).
[80] *Id.*
[81] *Brittingham v. Town of Georgetown*, 113 A.3d 519, 524–25 (Del. 2015).
[82] *See* Pls.' Reply and Opp'n at 5 ("If the Secretary is serious in asking whether he is required to 'verify' fraudulent or inaccurate information, Plaintiffs have a simple answer: 'no.'").
[83] *Id.* at 6 ("The duty is to act, and the Secretary has not done so.").

defined with "such precision and certainty that nothing is left to discretion or judgment."[84]  Specifically, the statute does not provide for what the Secretary must do if he believes the bills do not conform to the requirements of Section 604 or are otherwise not true and correct.  Can he ignore them (as he did with the 2021 tuition tax bills) or send a terse email (as he did regarding the 2022 tuition tax bills), or must he provide a statement of reasons for denying certification?  The Court finds nothing in the statute compelling the Secretary to inform charter schools of his reasons for not certifying the bills.  A writ of mandamus requiring him merely "to act" is too open-ended to be legally enforceable, and a more specific writ would require this Court to overstep the narrow confines of its mandamus jurisdiction and fashion relief more akin to an affirmative injunction.

The Court finds useful a comparison to *Kelley v. Delaware Alcoholic Beverage Control Commission*, a case in which this Court issued a writ of mandamus compelling the Delaware Alcoholic Beverage Control Commission "to consider plaintiff's license application on its merits and to render a decision thereon as soon as is practically possible."[85]  The statute in that case provided that "[t]he Commission shall examine all applications for license as promptly as possible, and *if it appears that any application should not be granted, the Commission shall so notify the applicant, stating the cause for refusal.*"[86]  Thus, the statute required the Commission not only to "undertake meritorious consideration" of each application, but also contained language explicitly requiring it to "either grant or deny the applicant's request."[87]  By contrast, 14 *Del. C.* § 602(c) requires the Secretary to verify the bills but does not provide any specifics as to what the Secretary must do

---

[84] *Guy*, 1993 WL 557938, at *1.

[85] 423 A.2d 507, 511 (Del. Super. 1980).

[86] *Id.* at 510 (emphasis supplied) (quoting 4 *Del. C.* § 541(a) (1980) (*amended by* 72 Del. Laws, ch. 486, § 16 (2000))).

[87] *Id.*

if he or she rejects the bills on the merits. Thus, the Court could not craft mandamus relief without adding parameters not contained in the statute itself. Accordingly, Plaintiffs' motion for judgment on the pleadings with respect to the mandamus count is **DENIED**, and Defendant's cross-motion for judgment on the pleadings on that count is **GRANTED**.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for judgment on the pleadings is **DENIED** and Defendant's cross-motion for judgment on the pleadings is **GRANTED**. Because the Court is not deciding on the merits whether the bills submitted by Plaintiffs are "bills for tuition charges" for services "appropriately financed" pursuant to 14 *Del. C.* § 604, the action shall be **DISMISSED WITHOUT PREJUDICE**.[88]

**IT IS SO ORDERED.**

Noel Eason Primos, Judge

NEP:tls
*Via File & ServeXpress*
oc:     Prothonotary
cc:     Counsel of Record

---

[88] Defendant requested dismissal of all counts in his answer, *see* Answer Prayer for Relief, and dismissal with prejudice in his cross-motion and opposition. Def.'s Cross-Mot. and Opp'n at 10–11. Dismissal without prejudice is appropriate where judgment on the pleadings is granted without a full adjudication of the merits. *See, e.g.*, *Aveta Inc. v. Bengoa*, 2008 WL 5255818, at *4 (Del. Ch. Dec. 11, 2008) ("[T]he court will enter an order that the plaintiffs' motion for judgment on the pleadings is granted and the defendant's claims are dismissed without prejudice to be considered by the arbitrator.").

24